Roy P. Woodruff, Plaintiff-Appellant, v. The Pennsylvania Railroad Company, a Corporation, Defendant-Appellee.

Gen. No. 49,318.

First District, First Division.

October 19, 1964.

Rehearing denied November 9, 1964.

Henslee & Henslee, of Chicago (Robert E. Harrington and John J. Naughton, of counsel), for appellant.

Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago (Max E. Wildman and John M. O'Connor, Jr., of counsel), for appellee.

MR. PRESIDING JUSTICE MURPHY delivered the opinion of the court.

This is a Federal Employers' Liability Act case, in which plaintiff appeals from a judgment for defendant, entered on a not guilty verdict. The plaintiff, Roy P. Woodruff, employed as a signalman for the defendant railroad, seeks to recover for back injuries received when he fell from a signal pole, contending that the pole climbing equipment (leg irons) furnished him by defendant was not reasonably safe.

The principal question on appeal is whether prejudicial error was committed by the trial judge in admitting into evidence, as admissions, portions of a statement signed by plaintiff shortly after the occurrence, wherein he stated that the leg irons were new and sharp, and that he did not know what caused his fall; and in permitting those portions of the statement to be taken by the jury to the jury room.

On the morning of March 25, 1960, plaintiff was descending from a 25-foot pole, when he fell about ten feet to the ground. As a pole climber, his equipment consisted of a body belt, a safety belt, and leg irons. A leg iron is a strap of metal, between 16 and 18 inches long, curved at the bottom to form a stirrup. The irons are secured to the leg by means of straps. A metal spur or gaff extends from the lower part of the leg iron. When climbing or descending

343

a pole, the climber's legs are held out at a 30-degree angle from the pole, and the spur is inserted into the pole and removed as steps of about 5 to 8 inches are taken.

Plaintiff testified that he had been working as a signalman for the defendant for approximately three years prior to the occurrence, signal pole climbing being part of his duties. He said that he had been using his own leg irons when he went to his foreman, Merrill Hershberger, two or three days prior to the occurrence, and told him that the spurs were becoming so short they were unsafe. Hershberger found a pair of company leg irons and gave them to plaintiff. He complained to Hershberger that the irons were too long for his legs, and that the "gaff on one of the hooks was shorter. To me, it looked like it was a converted tree gaff that had been ground down to match the other one." He was told that no other climbers were available.

As to the occurrence on March 25, 1960, plaintiff testified, "The first time I used these new gaffs that were issued to me was on the morning of the accident. I climbed two or three poles prior to the accident on that morning." He further said he had the safety belt around the pole and, as was customary, he unsnapped the safety belt, removed the left spur from the pole, and inserted it into the pole at a lower point. He started to take a step with the right foot, and he fell to the ground. A fellow employee testified, "I first learned of the accident when I heard a thud and looked around and I seen Roy. I believe he was on the ground, or just getting up; I forget which it was. He was not unconscious. He did not say anything about how the accident occurred. He did not say anything about his equipment. He did work the rest of the day, doing some climbing the rest of that day."

Plaintiff's witness, Walter H. Perry, a signalman, testified, "I was present when Mr. Hershberger is-

sued these leg irons. . . . and he said we would have to use them because these leg irons were all we could get for now." He further testified that when plaintiff fell, he was approximately 120 to 130 feet away. He saw plaintiff finish his job on the pole and start to climb down, and later "I heard him holler. He was laying at the bottom of the pole. . . . He was hurt and the wind was knocked out of him. We tried to move him. Woodruff then said to leave him lay there for awhile until he got his breath back. . . . He didn't perform any more work on that day except on the ground."

On cross-examination, Perry testified: "After the accident I looked at the gaffs on Mr. Woodruff's climbers. By the gaffs, I mean the spurs. . . . There was a difference between the lengths of those spurs. That difference was about an eighth to a quarter of an inch. The gaffs are supposed to be a minimum length of an inch and a quarter. Both of these gaffs were well over the inch and a quarter. The inch and a quarter is the required minimum length. Both gaffs were sharp. As to whether there was anything wrong with them other than the difference in the lengths of the gaff, one looked like a tree hook cut off, it was curved out more than the other. One gaff came straight down like a regular pole hook and the other looked like a tree gaff cut off. . . ."

Perry, when questioned about a statement given by him in September, 1962, a few months before trial, to a claim agent of the defendant railroad, said: "I have examined that document as to what it says about the gaffs. I see it says here that I say both gaffs were sharpened and there was nothing wrong with the gaffs. . . . He only had one accident with these climbers. I had seen the pole on which Mr. Woodruff had been working. I looked at that pole after the accident. I didn't notice any gaff marks on it or any

345

cut out marks where there was any indication of one spur having cut out. As to whether there was anything wrong with the pole, I don't remember the pole that well. . . . If it is in the statement that I said I didn't notice any defects in the pole occupied by Woodruff then I must have stated it. . . . If it's in the statement, I said in September 'from time to time Woodruff complained to me about his back before the time of this accident.' I have examined the statement and that sentence is in there." Perry's statement was introduced into evidence for impeachment purposes and was *not* sent to the jury room.

Defendant's witnesses included the foreman, Hershberger, who did not deny plaintiff's testimony as to the conversation about the issuance of the leg irons, but said he did not recall it. He testified that when he issued the leg irons to plaintiff, he observed there was a slight variation in the length of the spurs, but he did not then measure them. On Hershberger's identification, the leg irons issued to plaintiff shortly before the occurrence were received in evidence. Plaintiff's old leg irons were also received in evidence.

Defendant's witness, Fred McNamara, employed by defendant as supervisor of communications and signals and a former signalman for about twenty years, testified as to the leg irons in issue: ". . . As for telling whether they are in proper condition for climbing, I wouldn't hesitate to use them. The minimum length of the spur required is an inch and a quarter. At your request I did bring a ruler. Measuring on the back side, the length of the spur is one and $15/16$ths of an inch; that's as close as I can read it. That is a 16th of an inch under two inches. This is referring to Exhibit 2. Referring to Exhibit 2–A. This one is two inches, I would say. . . . In my opinion, $1/16$th or $2/16$ths, at the most, wouldn't make any difference in climbing

with those spurs. I don't think that you would feel the difference at all." He also examined plaintiff's old spurs and testified: "As for marking Defendant's Exhibit 3 for you and telling you the length of those; an inch and $5/16$ths. Measuring 3–A; an inch and $7/16$ths. That would be a variance of $2/16$ths or one-eighth of an inch." As to the spurs in issue, he testified: ". . . those are for climbing poles. . . . These are not tree climbing equipment."

Defendant's witness, J. A. Moore, a supervisor who "climbed poles probably ten to twelve years," made a personal investigation of the occurrence and the pole and spurs. As to the pole, "I found nothing unusual." He testified as to the difference between tree climbing spurs and pole climbing spurs, and as to the spurs in issue he said: "I find nothing defective about those."

Another witness for defendant, W. G. Miles, an Illinois Bell Telephone Company plant training center supervisor, examined the climbers and testified that they were good gaffs or spurs in his opinion. As to the maximum safe variation in length of the spurs, he said: "I don't believe a sixteenth or an eighth of an inch is of any significance because you have got a good point here on both of them and they're filed exactly the same. You should get almost exactly the same penetration in a pole. If you have one a half-inch longer than the other, that would be bad. But our field specification says to check those within one-eighth inch. If there is more than one-eighth inch difference in the length of the gaffs, then we should file them or send them in for machine grinding. . . . According to our safety specifications, one-eighth inch is the maximum. . . . Anything over that I consider something wrong. As to whether that would cause a cut out, I don't feel so myself, because an eighth is a fairly short distance actually . . . ."

The statement, portions of which are in issue, was made and signed by plaintiff during an investigation of the occurrence, four days later, on March 29, 1960, wherein plaintiff said in question and answer form that he did not "have any idea" what caused his spur to cut out and, also, that the spurs "are brand new and sharp." Defendant contends that the statement contains admissions against interest and they were admitted into evidence as such, and the action of the trial judge in allowing the jury to take the exhibits to the jury room was within his discretion.

The record indicates that the "admissions" initially entered the case during the presentation of plaintiff's case. He was recalled, over objection, for further cross-examination and testified that he was asked the two questions and made the two answers in issue. During the presentation of defendant's case, in the examination of plaintiff as an adverse witness, he identified defendant's Exhibit 23 in the following fashion: "After I reported this accident to Mr. Hershberger on Monday, a statement was taken on Tuesday and I think that statement was in longhand. [Exhibit 7.] Following that, it was typed up and submitted to me for signature. [Exhibit 23.] Looking at what has been marked Exhibit 23, this is the same statement after it was typed up. It consists of two pages and I signed both of the pages. As far as I can see, that statement is now in the same condition it was in at the time I signed it."

Defendant's Exhibits 7 and 23 were then offered in evidence, and a statement was made of the purpose for which offered—"They are offered not as impeaching, but as admission against interest."

Objections that the two exhibits were repetitious, self-serving statements and improper evidence were overruled as to the two questions and answers. After considerable argument and research, and apparently

on the authority of Jacks v. Woodruff, 9 Ill App2d 224, 132 NE2d 603 (1956), and Stanton v. Pennsylvania R. Co., 32 Ill App2d 406, 178 NE2d 121 (1961), the trial court admitted in evidence that part of defendant's Exhibit 23 in issue. In a discussion as to what exhibits would go to the jury room, the trial court, over plaintiff's objection, permitted the following part of Exhibit 23 to be taken by the jury to the jury room:

"Q. Do you know what caused your spur to cut out?
A. No, I don't have any idea.
Q. What was the condition of your spurs?
A. They are brand new and sharp.
Q. Do you have anything to add to this statement?
A. No.
Q. Do you have any comments or criticisms as to the manner in which this investigation has been conducted?
A. No, sir.

/s/ Roy P. Woodruff."

The plaintiff first contends the admitting into evidence of plaintiff's statement was error because there was no contradiction or inconsistency between plaintiff's testimony at the trial and his prior statement. Such inconsistency is necessary, the plaintiff contends, in order that such prior statements be admissible as either admissions or as impeachment.

■ We view the statement made by plaintiff prior to trial as an admission, not as impeachment, and, as such, the required inconsistency is minimal. Wigmore on Evidence, Vol IV, § 1048(1)(b):

". . . Thus, in effect and broadly, *anything said by the party-opponent may be used against*

349

*him as an admission,* provided it exhibits the quality of inconsistency with the facts now asserted by him in pleadings or in testimony. *(This proviso never needs to be enforced, because no party offers thus his opponent's statement unless it does appear to be inconsistent.)"* (Emphasis supplied.)

The foregoing test is met here. Plaintiff's prior statement that the spurs on the leg irons issued to him were *"brand new* and sharp" is inconsistent with some of his trial testimony, but is inconsistent with his testimony that the equipment looked like converted, ground down, tree climbing spurs. Plaintiff's prior statement that he did not have any idea why his spurs "cut out" is inconsistent with his claim at the trial that the allegedly unsafe equipment furnished him by the defendant was the proximate cause of his fall.

The plaintiff also contends that the admissions were irrelevant, that is, they did not tend to prove any material issue in the case, and thus should have been excluded. We believe, on the contrary, that the plaintiff's statements concerning the condition of the spurs and the cause of his fall went to the two central issues in this case—the quality of the equipment furnished and the cause of the occurrence. Cf. Maltby v. Chicago Great Western Ry. Co., 347 Ill App 441, 106 NE2d 879 (1952).

We are not persuaded that the trial court erred in the handling of the "admissions" question. Defendant's counsel was careful as to the manner in which Exhibit 23 was offered in evidence—". . . not as impeaching, but as admission against interest." This qualification was used whenever there was any relative discussion. As stated in Jacks v. Woodruff, 9 Ill App2d 224 (p 233), 132 NE2d 603:

350

"Admissions are ordinarily admissible as original or substantive evidence of the truth of the statements made or of the existence of facts which they tend to establish; while they may be used to impeach or contradict the testimony of the party who made them, their admissibility does not depend on, nor should their effect be confined to, their tendency to do so."

██ ██ The plaintiff next contends that permitting the plaintiff's admissions to go to the jury room was reversible error in that it unfairly spotlighted the admissions and confused the jury. First, the Appellate Court cannot speculate, under the circumstances presented here, as to the clarity of the mental processes of the jury. (Schneiderman v. Interstate Transit Lines, 401 Ill 172, 81 NE2d 861 (1948).) Second, the admissions were substantive evidence, and, as such, can, within the sound discretion of the court, be taken by the jury into the jury room. We note further that the trial court relied on Stanton v. Pennsylvania Railroad Co., 32 Ill App2d 406, 178 NE2d 121, which states (pp 411, 412):

"Plaintiff, pointing out that Par 67(4) of the Civil Practice Act provides that papers read or received in evidence, other than depositions, may be carried from the bar by the jury, says that it has long been established that such provision does not include written statements of a witness used to impeach, and that it is reversible error to permit them to go to the jury room, citing Johnson v. N. K. Fairbank Co., 156 Ill App 381; Nelson v. Northwestern El. R. Co., 170 Ill App 119; West Frankfort v. A. C. Marsh Lodge, 315 Ill 32, 145 NE 711. Plaintiff emphasizes that the exhibits were not substantive evidence competent

351

to prove his physical condition, but were admissible only to contradict him. Plaintiff's testimony as to his signature to the application was evasive. Eventually he admitted that he signed the application. We think that these exhibits were also admissions against interest. The action of the trial judge in allowing the jury to take the exhibits to the jury room was within his discretion. The correctness of the ruling of the trial judge on the exhibits going to the jurors for their examination in considering their verdict should be determined on the record as it stood at the close of the trial. We are satisfied that the court did not err in permitting these exhibits to be taken by the jurors in considering their verdict. . . . The judgment is affirmed."

While the ruling of the trial court in permitting part of Exhibit 23 to go to the jury room might be debatable, we cannot say, in the over-all consideration of this record, that there was an abuse of discretion. The two significant questions and answers were placed in the record during the plaintiff's cross-examination, and the jury was early alerted to this important part of the defendant's case. It was again presented as part of the examination of the plaintiff as an adverse witness. It is not reasonable to believe that the jury would have overlooked or forgotten plaintiff's answers during their deliberation. We do not believe, in deciding when an item of evidence should be allowed to go to the jury room, that the discretion of the trial court should be limited because the evidence in question happens to be an admission.

██ Plaintiff further contends that the trial court committed prejudicial error in instructing the jury that the credibility of a witness might be attacked by proving prior inconsistent statements on material issues, when the issues were not defined in the in-

structions, and compounded its error by engaging in a colloquy with the jury about the only such statement after they had retired for deliberations, all being over objections by plaintiff. Defendant's instruction 4 is:

"The credibility of a witness may be attacked by introducing evidence that on some former occasion he made a statement inconsistent with his testimony in this case on a matter material to the issues. Evidence of this kind may be considered by you in connection with all the other facts and circumstances in evidence in deciding the weight to be given to the testimony of that witness."

This is IPI instruction 3.01, and the note on its use requires that an instruction defining the issues which are material must accompany it.

We find no error here. The record shows the defendant did offer an issue instruction which, on objection of plaintiff, was refused because it included an issue which was withdrawn by plaintiff during the conference on instructions, and no other issue instruction was offered by either side. Under these circumstances, a party cannot complain of the absence of an issue-defining instruction which he himself has failed to offer. (Beckstrom v. Montgomery Ward & Co., 20 Ill App2d 353, 359, 156 NE2d 230 (1959); Warnes v. Champaign County Seed Co., 5 Ill App2d 151, 124 NE2d 695 (1955).) As said in Schneiderman v. Interstate Transit Lines, 401 Ill 172, 180, 81 NE2d 861:

"We are not receding from our position that the matters material to a lawsuit should be made known to a jury before such instructions are given, but we should also remember that jurors are presumed to have some intelligence, and we cannot go outside of the record to speculate upon what issues they might have had in mind when

all of the issues considered by counsel on both sides of the case were presented to the jury and it was given an opportunity to measure the materiality of the issues, or what facts are material to the issues, by what is pointed out in other instructions in the case."

■ We are not persuaded, as contended by plaintiff, that there is not sufficient evidence present here to support the verdict of not guilty. In FELA cases the standard to be applied by the reviewing court in determining the sufficiency of the evidence is that there must be an evidentiary basis for the jury's verdict, and "only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." Bowman v. Illinois Cent. R. Co., 11 Ill2d 186, 200, 201, 142 NE2d 104 (1957); McCorkel v. Pennsylvania R. Co., 32 Ill App2d 193, 196, 177 NE2d 369 (1961).

■ Considering this record, we have concluded, as stated by plaintiff, "When all the evidence is considered, the primary issue in this case was whether the climbers used by plaintiff on the day of his injury were reasonably safe. The climbers were received in evidence and the spurs were different in length." Defendant presented three experienced witnesses who testified in substance that there was "nothing defective about those," and that the difference in the length of the spurs was not "of any significance because you have got a good point here on both of them and they're filed exactly the same." We believe the verdict of the jury is supported by sufficient evidence in the record.

For the reasons given, the judgment for defendant is affirmed.

Affirmed.

BURMAN and KLUCZYNSKI, JJ., concur.