THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* TODD B. GORSUCH, Defendant-Appellant.

(No. 71-177;

Third District—May 2, 1974.

James Geis, Deputy Defender, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (James Christy, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE DIXON delivered the opinion of the court:

After juvenile proceedings the defendant, Todd B. Gorsuch, was indicted for the murders of his sister, Theresa Gorsuch and her friend Rebecca Staley. A jury returned verdicts of guilty on both counts and on June 1, 1971, the defendant was sentenced by the Circuit Court of Peoria County to concurrent terms of not less than 25 nor more than 60 years. He appeals.

The contentions raised are:

1. That he was not proven guilty beyond a reasonable doubt.
2. That the trial court erred in not determining competency of an 11-year-old prosecution witness even though no objection was raised at trial.
3. That the trial court erred in denying defendant's motion to suppress an exhibit.
4. That the former section of the Juvenile Court Act which allows a child to be prosecuted as an adult is unconstitutional.
5. That the sentences are excessive.

Around 3 P.M. on the afternoon of October 3, 1970, the defendant, then aged 14, left the Gorsuch home to go into a nearby woods. He was accompanied by his younger brother and sister, Tim and Theresa and two neighbor children, Ed and Rebecca Staley. The defendant was carrying a .410-gauge shotgun and ammunition for the weapon.

The five children remained together until they arrived at a place in the woods called Suds Falls, a pond with a waterfall effect. The two girls and the defendant went on from there to pick up hickory nuts.

Tim and Ed remained at the falls for 15 or 20 minutes and then went back to the Gorsuch home.

After they returned, the defendant came home without his sister, Theresa, or Rebecca Staley.

The two girls failed to return by early evening and so members of both families, a sheriff's group and volunteers formed a search party to look for them. The bodies of the two girls were found in the woods in the southeast corner of the Gorsuch property and, after an autopsy, were found to have been killed by shots to the heart from a .410-gauge shotgun.

On October 4, 1970, the sheriff of Peoria County asked to inspect the .410-gauge shotgun in the Gorsuch house, to have it shot and compared with markings on the shells found at the crime scene to eliminate any of the Gorsuch guns from the gun that may have murdered the girls. One of the sheriff's deputies, after inspecting the muzzle of the gun carried into the woods by defendant noticed a red substance inside the barrel which later testing proved to be human group B blood with fibers mixed in it. Theresa Gorsuch's blood was group B. An expert gave opinion that the fibers were similar to fibers from Theresa's T-shirt. The defendant was arrested for the murders of Theresa Gorsuch and Rebecca Staley.

A lengthy juvenile detention hearing was held and the judge found that probable cause existed that the defendant had committed the crime for which he was detained. On petition of the State's Attorney the defendant was removed from the jurisdiction of the juvenile court to be prosecuted as an adult by indictments for two counts each of murder and involuntary manslaughter.

The defendant was tried before a jury on the indictments. Prior to trial, defendant moved to suppress the .410 shotgun basing his motion on an alleged and illegal seizure by the sheriff of this weapon. A hearing was had on the motion, and after hearing the evidence on both sides, the court denied the motion to suppress.

At the trial, Ed Staley, age 11, brother of Rebecca Staley, testified that Theresa Gorsuch, Tim Gorsuch, his sister and he left the Staley home to go to Suds Falls and in order to get there went first to the Gorsuch home where they met the defendant. At that time, the defendant had the .410-gauge Steven's single shotgun, which was admitted into evidence as People's Exhibit 9. The defendant was about to go with the other four children into the woods behind the Gorsuch home to Suds Falls when Ed stated that he was forbidden by his parents to go with Todd if he had the shotgun. For this reason, Todd disassembled the

.410-gauge shotgun and the five children left the Gorsuch home together. The children then proceeded, for the most part in each other's company, until they reached a hill near Suds Falls which is on the property east of the Gorsuch property, belonging to a Mr. Kirkpatrick. At this point the children separated, Tim and Ed going to Suds Falls and the defendant, Theresa Gorsuch, and Rebecca Staley staying on the hill to rest. After playing at Suds Falls, Tim and Ed left and went to the Gorsuch home. Ed testified the last time he saw the girls alive was on the hill near Suds Falls in the company of the defendant, who still had the disassembled .410-gauge shotgun. Tim and Ed then proceeded to the Gorsuch house and played with their puppy. Ed testified that, when the pup relieved itself on the floor, Mrs. Gorsuch told Tim to clean up the mess, which he did, and the two of them then left the house where they saw the defendant for the first time since coming back from the woods. Ed Staley estimated that about 15 minutes had passed since he and Tim arrived at the house till the time they went out and saw Todd in the yard. This had been the first time that they had seen him since leaving him at the hill with Theresa Gorsuch and Rebecca Staley. Ed testified that when they saw Todd he was on the lawn mower in the yard, but did not remember whether he was mowing at that time. He did not see People's Exhibit 9 at that time. Ed further testified that he did not remember hearing any shots until that time. In fact there is no record that Ed heard any shots the whole day. Tim spoke briefly to Todd when they saw him and then he and Ed left the Gorsuch house and went to the Staley's.

The People also called as a witness one Eugene Ely, who testified that he was combining in the field directly south of the Gorsuch property on October 3, 1970, from 10 A.M. to 5 P.M. Mr. Ely stated that he also did not hear any shots at any time during which he was there that day. His combine was quite loud when operating.

Bernard Kennedy, sheriff of Peoria County, testified that he arrived at the Gorsuch home that evening to direct the search for the two girls. Their bodies were found about midnight. Sheriff Kennedy went to the place where the bodies were found on the Gorsuch property and noticed they were partially covered by some brush and appeared to have been dragged to the place where they were found. Sheriff Kennedy then called Robert Dubois from the State Crime Laboratory and the Coroner before he left the Gorsuch property. The next time Sheriff Kennedy arrived at the Gorsuch property was about 10:30 A.M. on October 4, 1970. He briefly visited the place where the bodies were found and it was pointed out to him by certain sheriff's deputies that three shotgun shells had been found. Sheriff Kennedy went then to the

Gorsuch home and the defendant stated that those were his shells, that he had shot at a squirrel and missed. The Sheriff then returned to the Gorsuch home and told Ronald Gorsuch, the defendant's father, that he would like to have the Gorsuch weapons to test fire them to see if there were any shells that had been found that were fired from a gun that was not one belonging to the Gorsuch family. After this, Ronald Gorsuch asked where the guns were, at which Ronald Gorsuch's father and the defendant retrieved two shotguns from under the davenport in the living room of the Gorsuch house; one of them was People's Exhibit 9. There was never an explanation as to how or why these guns were under the davenport. The guns were given to Deputy Conn of the sheriff's office who took them to a squad car. Sheriff Kennedy then returned to the place where the bodies had been found and observed People's Exhibit 9 being handed to Robert Dubois of the State Crime Laboratory, and then he left the scene.

Dr. Donald Burhans, the coroner's physician, testified that he performed an autopsy on the bodies of Rebecca Staley and Theresa Gorsuch. Dr. Burhans described the wound to Rebecca Staley as being a gunshot wound in the midline of the chest, slightly to the left at about the fourth rib and 2.2 inches in diameter. There was also a gunshot wound to the left scapula, which contained multiple-shot injuries and a piece of shotgun wadding. In his opinion the cause of death was due to a gunshot wound to the heart. Dr. Burhans then testified that he examined Theresa Gorsuch and found a gunshot wound with a portal of entry in the chest near the right breast, where there were also powder burns. He then found a second wound with a portal of entry in the midline of the lower abdomen. The cause of death in Dr. Burhans' opinion was hemorrhage due to a gunshot wound to the heart. Shotgun shots were recovered from both of the wounds of Theresa Gorsuch. In Dr. Burhans' opinion, both girls had been dead from 10 to 15 hours at the time of the autopsy. On cross-examination, Dr. Burhans stated that in his opinion the chest wound to Theresa Gorsuch more than likely came first, the wound to the abdomen coming after this. Dr. Burhans testified that he formed this opinion as to which shot came first due to the amount of hemorrhaging which occurred at the second wound. However, Dr. Burhans went on to testify that had either of the girls undergone either a physical or emotional shock at the time of the shooting, the blood pressure would have been lowered sufficiently that they would not have hemorrhaged even if it had been the first shot. Another reason for Dr. Burhans' uncertainty to the order of the shots to Theresa Gorsuch is the fact that, in the chest there will always be massive hemorrhaging unless the body is completely exsanguinated from another

wound. In the pelvic area where the other shot to Theresa Gorsuch occurred there are fewer and smaller blood vessels and bleeding is more controlled in that area. On redirect Dr. Burhans confirmed his earlier statement that he could not be absolutely certain as to which shot entered Theresa Gorsuch's body first.

The next witness to testify on behalf of the People was Robert Dubois of the Bureau of Identification of the Illinois Department Law Enforcement. Mr. Dubois testified that he was a crime-scene technician and that he was called to the Gorsuch property early in the morning of October 4, 1970, and observed the bodies of the two girls. After examining the general area of where the bodies were found, he ordered the removal of the bodies to the Wilton Mortuary in Peoria, Illinois, where he removed the clothes from both bodies. He returned to the Gorsuch property about 11 A.M. He returned to the crime scene and while there Deputy Conn of the sheriff's department delivered the .410-gauge shotgun, People's Exhibit 9. While looking through the barrel of People's Exhibit 9, he observed a red substance which appeared to him to be blood. He took People's Exhibit 9 with all the other evidence gathered at the crime scene to the Springfield Crime Laboratory and gave them to Brent DeWitt and Michael Kreiser, laboratory technicians.

Brent DeWitt testified that he is crime laboratory technician for the Illinois Bureau of Identification and was qualified as an expert in serology, the science dealing with blood and blood groupings. DeWitt testified that he received vaginal swabs, blood samples, material found inside the muzzle of People's Exhibit 9, People's Exhibit 9 itself and the clothes removed from the bodies of the girls. He performed tests on all of these items. Microscopic and acid phosphate tests were performed on the vaginal swabs and the result of these tests were negative for the presence of male sperm. On the clothes of both girls he performed benzedine and precipitine tests to determine if the substance found on the clothing was human blood. Evidence of human blood was found on certain articles of clothing of both girls. DeWitt, through the use of the Latch Crust Test, determined that the blood on the clothing of Theresa Gorsuch was of group B and that on the clothing of Rebecca Staley group A. DeWitt also, through the use of the same tests, determined that the blood sample taken from Theresa Gorsuch by Dr. Burhans was group B and that of Rebecca Staley group A. He did the tests mentioned above on the outside of People's Exhibit 9 to determine the presence of human blood, and found these tests to be negative. The tests were then performed on the inside of the muzzle of People's Exhibit 9 before the material was taken out and the tests proved positive for the presence of human blood. The material from

the muzzle was then removed and DeWitt performed additional tests on a portion of it and determined that the human blood that was present in the muzzle of People's Exhibit 9 was group B. He also found certain fibers in the dry blood which came from the muzzle of People's Exhibit 9. DeWitt examined these fibers microscopically and performed chemical tests to determine what type of material the fibers were. The tests showed that certain of the fibers were cotton and others man-made. Sample fibers from the multi-colored cotton T-shirt of Theresa Gorsuch were compared microscopically with the fibers found in the muzzle of People's Exhibit 9 and there were found to be white, yellow, red and brown cotton fibers in the group B blood in the muzzle of People's Exhibit 9, which were similar in type of fiber and color to the sample fibers taken from the T-shirt worn by Theresa Gorsuch.

Michael Kreiser, laboratory technician for the Bureau of Identification, was qualified as an expert in firearms and tool marks. Kreiser stated that he performed tests on the shot and wadding removed from the wounds of the girls and, in his opinion, they were fired from a .410-gauge shotgun shell. The shot which was examined was mutilated, but Kreiser was able to narrow down its size to either 7½, or 8 shot, either of which sizes can be fired from a .410-gauge shell. Kreiser also, through examinations of the existence of powder burns and the pattern of the shot, was of the opinion that the shot to Theresa Gorsuch's chest was fired with the muzzle of the weapon in contact with the clothing and body of the victim. On the same basis he was of the opinion that the shot to Theresa Gorsuch's abdomen was also in contact with her clothing and body when fired. Kreiser testified that the shot and wadding fired from a .410 shotgun would travel at the rate of 100 to 200 feet per second and would strike the body with such force that it would rip and tear into clothing, flesh and blood as the shot was expelled from the gun.

The defendant's case was based mainly on the testimony of the members of the Gorsuch family, his father, mother and brother, and the defendant himself. Tim Gorsuch, the brother of the defendant, testified to essentially the same story as Ed Staley, that the five children went into the woods behind the Gorsuch home together. When they reached a hill near Suds Falls he and Ed left Todd and the girls and played at Suds Falls. After about 15 or 20 minutes, he and Ed left the area for the Gorsuch home. Todd was with the girls when he and Ed left; he still had his .410-gauge shotgun with him which was still in a disassembled condition. Neither he nor Ed heard any shots on the way back to the Gorsuch house. When they arrived they went into the house and Mrs. Gorsuch told them to take the pup out of the house, which

they did and saw the defendant coming into the yard. Tim said they were in the house only about 5 minutes before going out and seeing him. They were in the yard a short period of time with the pup and then went back into the house with Todd. They then watched T.V. for awhile. During the time the two were watching, Tim claimed that he heard two faint shots, but he could not tell from what direction they came. He and Ed shortly thereafter left for the Staley home and the last time he saw Todd that afternoon he was mowing the lawn. On cross-examination, Tim testified that he had not seen anyone other than the four other children in the woods on October 3, 1970.

Ann Gorsuch, the mother of the defendant, stated that the children left the Gorsuch house about 1:30 to 2:30 P.M. on October 3, 1970. She saw Ed and Tim return later in the afternoon. They came into the house and immediately went out again into the yard. Mrs. Gorsuch testified that 5 minutes later Ed and Tim came back into the house accompanied by the defendant. Tim and Ed watched T.V. while Todd went outside to mow the lawn. She further stated that after a while Todd called her to the door and when she got to the door she heard two shots coming from the east, and Todd then told her about the long-haired hunter he claimed to have seen. These were the only two shots Mrs. Gorsuch testified to hearing. Finally, Mrs. Gorsuch testified that she observed her husband that evening after the girls' bodies had been found and saw that he had two deep cuts on his face and one on his wrist and these were bleeding at the time. On cross-examination Mrs. Gorsuch stated that she had not heard any shots until the time she was called to the door by Todd.

Ronald Gorsuch, the defendant's father, testified that he had worked the whole day on October 3, 1970, and returned home about 6:50 P.M. to find everyone there searching for the two girls. He went out to search with a neighbor on horseback and during the course of this search, his horse ran into some hedge trees and thorn bushes and he was knocked off. Mr. Gorsuch claimed that he sustained deep cuts on his face and both hands, which bled profusely. Mr. Gorsuch stated that the next morning the sheriff asked him to see the shotguns and that People's Exhibit 9 was retrieved from under the couch by his father and the defendant. Mr. Gorsuch stated that he took the gun from Todd, opened it, and checked the barrel both ways, closed it and stood it on the floor and leaned on it until the sheriff asked to see it, at which time he handed it to the sheriff. The sheriff's deputy then took People's Exhibit 9 out of the room. Mr. Gorsuch testified that he has group B blood.

Finally, the defendant took the stand and testified on his own behalf. His story was essentially the same as Tim and Ed, that he accom-

panied the four children into the woods behind the Gorsuch house carrying his .410-gauge shotgun, which was broken into three pieces. The defendant claimed to have only "two or three" shotgun shells with him at that time, one 7½ shot and one or two 6 shot shells. His story was similar to those of Ed and Tim as to the route taken to the woods, eventually ending at the hill near Suds Falls where they stopped and rested. After resting a while, Tim and Ed went to play at Suds Falls while he and the girls stayed to rest on the hill. The defendant testified that between 3 P.M. and 4 P.M. he and the girls went to Suds Falls and informed Tim and Ed that the three of them were going to pick hickory nuts. The last time he saw Tim and Ed was at Suds Falls. The defendant testified that he went with the girls to pick hickory nuts in the northeast corner of the Gorsuch property. After he picked hickory nuts for 5 minutes he claims that he left the girls to go home to mow the lawn. After traveling a ways along the fenceline between the Gorsuch property and Kirkpatrick property to the east, the defendant claims that he heard someone coming through the woods. He testified that he hid behind the bush and observed a long-haired hunter coming out of the woods. He said that this hunter was carrying a gun, he did not know what kind of a gun it was, but he recognized it to be smaller than a 12-gauge shotgun. The defendant testified that this hunter he claimed to have seen walked from the Gorsuch property to the Kirkpatrick property through the fence that separated the two. He did not see him again after that and did not know where he went. The defendant testified that he then made his way home and leaned his .410-gauge shotgun, which he had assembled as he approached the Gorsuch house, on the barn next to the house. He stated that he went into the house and then came out again to mow the lawn when he heard four or five shots which came from the East. He then called his mother to the door and told her the story about the long-haired hunter. The defendant denied having any arguments with either of the victims and denied having shot or killed either.

The defense then rested and the People called William A. Hill of the sheriff's department in rebuttal. Deputy Hill testified that he was at the Gorsuch property when the two girls were found in the early morning of October 4, 1970. He stated that when the girls were found to be dead Ronald Gorsuch became violent and tried to pull out a gun, so he and his partner had to restrain him by placing handcuffs on his wrists. During the course of placing these handcuffs on Ronald Gorsuch's wrists, Deputy Hill observed his hands and noticed no cuts or bleeding, only faint scratches and redness.

This was the end of the evidence for both sides. The jury deliberated

a total of 16 hours and returned verdicts of guilty on both murder counts.

After an extensive pre-sentence hearing, the defendant was sentenced to 25 to 60 years for each count of murder, which sentences were to be served concurrently. The defendant then took this appeal from the verdicts and sentences in this case.

■■ The case against the defendant rests upon circumstantial evidence and it is a correct statement that where the only evidence is circumstantial evidence the guilt of the accused must be so thoroughly established as to exclude every other reasonable hypothesis. (*People v. Lewellen*, 43 Ill.2d 74, 78.) This, however, does not require that guilt be proved beyond any possibility of a doubt. (*People v. Murdock*, 48 Ill.2d 362.) It is well settled that the commission of an offense may be established entirely by circumstantial evidence it being necessary only that proof of circumstances must be of a conclusive nature and tendency, leading on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, when taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt. (*People v. Bernette*, 30 Ill.2d 359, 367.) There is no legal distinction between direct and circumstantial evidence as to the weight and effect thereof. (*People v. Robinson*, 14 Ill.2d 325, 331.) Applying these principles to the instant case leads to the conclusion that the guilt of the defendant has been proved beyond reasonable doubt.

The defendant was the last person to be seen with the two victims while they were alive. The defendant had a .410-gauge shotgun and some shells during the time he was alone with the girls. The girls were killed by shots to the heart from a .410; the shot to Theresa Gorsuch's chest was a contact shot. The .410 last in possession of defendant was found to have a substance in the muzzle that proved to. be group B human blood with fibers in it. Theresa Gorsuch had group B blood and the fibers were similar in color and kind as those on the multiple-colored T-shirt worn by Theresa when she was shot. The facts clearly show that defendant had the opportunity and means.

■■ The jury was justified to find the father's testimony as to how blood and fibers got in the muzzle as. not believable. If his hand was bleeding why was blood nowhere but inside the barrel? The jury was justified in concluding that defendant's hypothesis of innocence was not a reasonable one. It is the function of the jury to make a determination of the credibility of the witnesses and the weight to be given to the

totality of the testimony. We cannot overturn the verdict of the jury simply because some evidence presented to it was conflicting. (*People v. Brown,* 52 Ill.2d 94, 105, 106.) When all the facts are considered together we must reach the conclusion that the verdicts of the jury are supported by strong evidence of guilt beyond a reasonable doubt and to a moral certainty. We cannot substitute our judgment for that of the trier of fact except in cases where the evidence is so improbable or unreasonable as to raise a reasonable doubt of defendant's guilt. (*People v. Glover,* 49 Ill.2d 78.) We shall next consider the question of other errors raised by defendant.

Eleven-year-old Eddie Staley was allowed to testify at the trial without a preliminary examination by the Court. The governing rules concerning a child witness under 14 have been succinctly stated in *People v. Sims,* 113 Ill.App.2d 58, 61, and need not be restated. No objection was made to the competency of the witness. As was said in *People v. Matthews,* 17 Ill.2d 502, at page 506, "the defendant has the duty to raise an objection to the competency of a child as a witness at the time of trial, and the question cannot be raised for the first time on appeal." See *People v. Tappin,* 28 Ill.2d 95, 98.

In *People v. Bridgeforth,* 51 Ill.2d 52, 56, and in *People v. Montgomery,* 51 Ill.2d 198, 204, the supreme court reaffirmed *Matthews* but in *Bridgeforth* stated, "However, because of the damaging effect of the testimony, and its obvious importance to the case, we elect to review defendants' contentions."

In the case at bar the intelligence of the witness was ascertained by his appearance and conduct in the presence of the court. Further, Eddie was called to testify on three separate occasions, twice at the detention hearing and once at trial. At the detention hearing there was conducted a thorough and complete preliminary examination by the court and by defense counsel concerning Eddie's competency. There the judge found him to be competent to testify. This is obviously the reason the same defense counsel raised no objection at the trial. We have examined the trial testimony and find that Eddie was obviously competent to testify.

The trial court, after an extensive evidentiary hearing on a motion to suppress found that People's Exhibit 9, the .410-gauge shotgun, was removed by the sheriff of Peoria County from the Gorsuch residence, "with the consent of those entitled to give consent, that consent was valid and not in violation of any constitutional rights * * *." Defendant contends that the record fails to show the requisite facts for such a finding.

The testimony of Sheriff Kennedy established that he had gone to

the Gorsuch residence between 10:30 and 11 A.M. on October 4, 1970, the morning after the bodies of the two girls were found. He had by then learned that both girls died of shots from a .410-gauge shotgun. At the crime scene earlier that morning he found numerous spent .410-gauge shells lying around so he went to the Gorsuch house to get any .410 guns there for comparison purposes, in order to see if any shells were there that were not from a Gorsuch gun. At that time Sheriff Kennedy did not know that the defendant had a .410-gauge shotgun in his possession when he was in the woods with the girls. At that time the sheriff suspected no one in the Gorsuch family. The suspect at that time was the "long-haired hunter" defendant claimed to have seen. The sheriff went to the house to ask for cooperation in his investigation. He was freely admitted to the house by Mrs. Gorsuch. He told Ronald Gorsuch, the father, that both girls had been shot twice and that he would like to have any .410 guns belonging to the Gorsuch family for comparison to find any alien shell that might have come from another weapon. The father determined where the weapons were, with help from defendant and Exhibit 9 and another gun were removed from under a davenport by Todd, given to his father who, in turn, gave them to a deputy who was present with the sheriff.

Ronald Gorsuch testified that he specifically told the sheriff, "if you take these guns from this house it is under protest." This statement was corroborated by William Herman, a friend of the family and by the defendant.

■■■ The question of whether consent has been given is a factual matter to be initially determined by the trial court, and where the evidence on the issue is in conflict the reviewing court will accept the finding below unless it is clearly unreasonable. Because a court of review is not in a position to observe the witnesses as they testify, questions of credibility and the weight to be given their testimony must be left largely in the discretion of the trial court. It follows that we are bound to accept the testimony given by the sheriff because it cannot be said that it is clearly unreasonable. We are not similarly bound, however, to accept the trial court's ruling on the motion if, as a matter of law based on the facts as established by that testimony, it cannot be said that a legally sufficient consent was given. (*People v. Haskell*, 41 Ill.2d 25, 30.) In other words the relative credibility of the witnesses is not the issue before this court. The real issue is whether the testimony of Sheriff Kennedy, taken at full value, meets the required standards for consent.

■■■ These standards have been defined in numerous instances. It is clear that consent must be proven by clear and positive testimony, and

it must be established that there was no duress or coercion, actual or implied. The prosecution must show a consent that is unequivocal and specific, freely and intelligently given. Courts indulge every reasonable presumption against waiver of fundamental constitutional rights. While it is not required that the People show that the consenting party was advised of rights secured by the fourth amendment, the failure to do so is a factor bearing on the understanding nature of the consent. *People v. Haskell, supra,* page 31.

When measured by these standards we think the evidence in this case does establish a legally effective waiver of the right against unreasonable search and seizure. We believe the gun was freely given to the sheriff. After the deputy inadvertently discovered the blood in the muzzle it became too late to withdraw consent. *United States v. Ponder,* 444 F.2d 816, *cert. denied,* 405 U.S. 918, 30 L.Ed.2d 788, 92 S.Ct. 944.

█ The contention that former section 702—7(3) of chapter 37 (Ill. Rev. Stat. 1969, ch. 37, par. 702—7(3)) is unconstitutional has recently been settled by our supreme court in *People v. Sprinkle,* 56 Ill.2d 257, 307 N.E.2d 161. Also, see *People v. Bombacino,* 51 Ill.2d 17, 19-20, and *People v. Handley,* 51 Ill.2d 229, 233. We conclude that the statute in question is valid and reject defendant's contention.

The last contention of defendant is that 25-to-60-year concurrent sentences for a 14-year-old defendant with an exemplary background are excessive.

█ It is well-established law in Illinois that where it is claimed that the sentence imposed on a defendant is excessive, though within the limits prescribed by the legislature, that sentence should not be disturbed unless it is greatly at variance with the purpose and spirit of the law or manifestly in excess of the proscriptions of the Illinois Constitution. The trial court is normally in a better position during the trial and hearing in aggravation and mitigation to make a sound determination as to the punishment to be imposed than are courts of review. *People v. Hampton,* 44 Ill.2d 41.

We believe that these principles relative to sentencing have not been violated here. We find no reason to disturb the sentences.

The judgment of the Circuit Court of Peoria County is affirmed.

Judgment affirmed.

SCOTT, P. J., and STOUDER, J., concur.