*In re* JACKIE ALLEN WHEELER *et al.*, Minors.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* ROBYN WHEELER *et al.*, Respondents-Appellants.)

Third District  Nos. 79-402, 79-485 cons.

Opinion filed July 25, 1980.

Mark Belokon, of West Central Illinois Legal Assistance, of Lewistown, and Claudon, Lloyd & Barnhart, Ltd., of Canton, for appellants.

Thomas Homer, State's Attorney, of Lewistown (Thomas Maas, Assistant State's Attorney, and John X. Breslin, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Michael E. Morris, of Canton, guardian ad litem.

Mr. JUSTICE STENGEL delivered the opinion of the court:

Robyn and Dorothy Wheeler appeal from orders of the Circuit Court of Fulton County which found their three minor children to be neglected

as a result of physical abuse inflicted by the parents and which terminated their parental rights and authorized the children's guardian to consent to adoption.

The unfortunate history of the Wheeler children unfolded gradually before the court as each witness added a chapter to the sordid story. A summary of that testimony is necessary to a discussion of the issues presented upon appeal. At the age of 14 Dorothy Wheeler gave birth to a son, Jackie Allen, in February 1971, and she continued to live with her parents in Peoria until she married Robyn Wheeler in November of 1973. Six months later a second son was born, Robin Lee, and in 1976 a daughter Tina was born. The Wheelers were receiving help from the Peoria office of the Illinois Department of Children and Family Services until 1978 when they moved from Peoria to Fulton County without notifying DCFS.

In April of 1978 DCFS caseworker Henry Pierson visited the Wheelers at their farm home in Farmington, Illinois. At that time the father admitted to Pierson that he used to get drunk and abuse his son Jackie and his wife quite frequently when they lived in Peoria. In October of 1978 the family moved to Mulligan's Trailer Court in Canton. Four-year-old Robin was enrolled in a preschool program in December of 1978. He was transported by bus, and because he was left off across a highway from the trailer court, he had to be met when the bus brought him home about 10:30 a.m. He attended the program only 9 days, and on 4 of those days no one came to meet him, so the bus driver had to take him back to school.

Linda Pollitt, a DCFS homemaker, visited the Wheeler home twice each week beginning in April of 1978. She testified to the stench and filth of the home in Farmington which lacked indoor plumbing. She repeatedly saw human waste lying on the kitchen floor and caked on the two younger children who apparently were smeared by their parents with their own feces when they "messed their pants." Mrs. Pollitt instructed the parents in the basic principles of personal hygiene, including daily bathing. She stressed the importance of dressing the children in clean clothes and even brought them clean clothing, soap, shampoo, towels, washcloths, toothbrushes and tooth paste. She explained the importance of nutritious meals. Because 3-year-old Tina was sleeping with her parents, Mrs. Pollitt brought a crib, but the father returned it, saying that Tina wouldn't sleep in it. On four different occasions the father threatened bodily harm to Mrs. Pollitt, including threats to kill her, so on several occasions she was accompanied to the Wheelers by another homemaker "for protection." That homemaker, Betty Rilea, corroborated Mrs. Pollitt's description of the conditions of "unbelievable" filth in the Wheeler home and the presence of dried human waste on the children.

Both women stated that, in spite of all their instructions and help, there was no lasting improvement in the living conditions in the home, and the home in Canton soon deteriorated into the same dirty condition as the house in Farmington.

On February 20, 1979, DCFS removed the children from the Wheeler home and secured emergency foster care for them. A week later, the children were transferred to the custody of the Fulton County Juvenile Probation Office and placed in a permanent foster home. The foster parents were called to testify for the State. Because of threats to other witnesses and because of the father's propensity to violence, the State requested that the names of the foster parents not be referred to in open court. All parties agreed. We shall provide those witnesses with the same protection of anonymity here.

The first foster parents who testified (Mr. and Mrs. X) had custody of all three children for 7 days. When the children came, they smelled bad, had filthy hair, and were genuinely hungry. While bathing Jackie, Mrs. X saw a bad sore on his penis. He said his dad had put a hot screwdriver on his penis while he was asleep. She also saw small round pit marks on Jackie's back and a bad sore on Robin's nose. Robin, who was four, did not know he was supposed to use the bathroom for bowel movements. Mr. and Mrs. X toilet trained him in 3 days. The children ate as though they might not be fed again and had to be repeatedly assured that there would be food again at the next mealtime. The only foods they knew were macaroni and cheese and spaghetti. Jackie was described as a "slow learner" but not retarded.

The second foster mother (Mrs. Y) also testified, describing Jackie's nightmares, and the red marks on both Jackie and Robin that appeared to be burns. She also recounted an incident where 3-year-old Tina pretended to have intercourse with her doll, and she described the children's fear that they might not have another meal.

Also testifying for the State was Dr. Dennis Cappitelli, a pediatrician, who had seen the children on March 7, 1979. He stated that he was asked to examine each child for suspected child abuse and that the children's guardian had told him that on several occasions, Jackie woke at night with a nightmare, screaming, "Mommy, Mommy, please stop." An objection to this testimony as hearsay was overruled. The doctor observed marks on Jackie's back which Jackie said were made by burns with a cigarette lighter. Dr. Cappitelli next described six old circular scars on Robin's back, six or seven such scars on his chest, four more recent ones across his genitalia, and three in his inner thighs. All the scars were circular with a diameter of 1.5 to 2.0 mm. The older scars were described as more than one month old and depigmented, while the more recent ones still had scabs. In the doctor's opinion, these scars were caused by a lighted

cigarette. Robin was noted to be very withdrawn and had signs of autism. Tina had a scar on her arm such as would be made by boiling water, and she had six small circular lesions on her back like those on Robin's back. Dr. Cappitelli also said that in his opinion, on the basis of his examination, two of the children had been physically abused "with certainty" and the third one "possibly."

In addition to the above witnesses, Jackie was questioned by the court and by the attorneys in chambers. Many of his answers were irrelevant, but he did mention getting whipped with a belt and said his dad burned him with a hot screwdriver and with a torch.

The first witness to testify for the parents was the Wheeler family doctor, who occasionally treated the children. The only abnormality he noted in Jackie was an eye condition. Robin was treated once for an infected toenail and once for impetigo on his upper lip. In April of 1979 he noted chicken pox scars on Robin and on Tina, but found no evidence of abuse on any of the children. He stated that the father is "slow" and that the mother has a bad case of asthma and as a consequence "there are probably times when the kids don't get cleaned and dressed in the proper way," but he did not consider that to be abuse.

Mr. Wheeler's cousin testified that the Wheeler family was happy and clean when they lived in Peoria. The parents disciplined by spanking with the hand. Similar testimony was provided by Mrs. Wheeler's 14-year-old sister who spent two weeks in the Wheeler home in Canton in November of 1978 and who had visited them in Peoria and in Farmington. She described the frequent baths and laundering of clothes and daily washing of dishes. She said the floors were washed twice a week, the food was excellent, and the discipline was mild. She also admitted that, when she was with the Wheelers, she had run away from home after stealing $97 from a cousin of Mr. Wheeler.

The mother was called as a witness on behalf of the children. She said, *inter alia*, that she did not notify DCFS when they moved from Peoria to Canton because the family was "doing real good."

In the adjudicatory order, the trial court found the children to be neglected minors; found the neglect to be a result of physical abuse inflicted by the parents; and found the parents unfit in that they (1) failed to maintain a reasonable degree of interest, concern or responsibility for the childrens' welfare, (2) allowed substantial neglect of the children to be continuous and repeated, (3) performed extreme and repeated cruelty to the children, and (4) failed to protect the children from injurious conditions within their environment. The court also ordered all parental rights of the father and mother terminated and authorized the children's guardian to consent to the adoption of the children. The parents have appealed from that order, and also from a subsequent dispositional order.

The two appeals (Nos. 79-402 and 79-485) have been consolidated in this court, and we affirm both.

The parents first contend that the evidence established, at the most, neglect caused by poverty and that children are not to be classified as neglected for economic reasons alone. (See Ill. Rev. Stat. 1979, ch. 37, par. 702—4(2).) They also insist that the evidence of physical abuse was not clear and convincing as is required in order to terminate parental rights. (See *In re Hurley* (1976), 44 Ill. App. 3d 260, 357 N.E.2d 815.) Because there was some contradiction in the evidence, the parents argue that it was not clear and convincing.

■■ Since we have previously summarized the evidence in considerable detail, we need not reiterate the evidence of physical and emotional injury, maltreatment, and desecration which the Wheeler children suffered at the hands of their parents. Most household pets receive better care than these children. The testimony of the parents' witnesses was found not credible by the trial court, and we have no reason to disturb that conclusion. On the basis of the record before us, we hold that the findings of neglect and parental unfitness were not contrary to the manifest weight of the evidence but rather were well-supported by the testimony of numerous witnesses.

■■ Next the parents argue that the court erred in admitting into evidence the *in camera* testimony of 8-year-old Jackie Wheeler without first establishing his competency. It is well established that, before a child under the age of 14 may testify, the trial judge must make a preliminary inquiry as to the child's competency as a witness by examining the child's intelligence, understanding, and moral sense. (*E.g., People v. Sims* (1969), 113 Ill. App. 2d 58, 251 N.E.2d 795.) However, defendants have a duty to raise any objection to the competency of a child as a witness at the time of trial, and the question cannot be raised for the first time upon appeal. (*People v. Matthews* (1959), 17 Ill. 2d 502, 162 N.E.2d 381.) In some criminal cases, because of the importance of the child's testimony, the reviewing court has, in the exercise of its discretion, elected to review the issue of competency raised for the first time upon appeal. (*E.g., People v. Gorsuch* (1974), 19 Ill. App. 3d 60, 310 N.E.2d 695.) In the instant case, we cannot say that Jackie's meager testimony was crucial to the State's case since it was, at most, merely cumulative of the evidence presented by adult witnesses. Accordingly, we conclude that the parents waived any error by failing to object at trial.

■■ ■ The parents also assign as error two instances where hearsay evidence was admitted over their objection. When Dr. Cappitelli testified concerning his examination of the children, he related statements made to him by the guardian about Jackie's nightmares and also statements made to him by Jackie concerning both boys being burned and hit with a belt.

As a general rule, an examining physician may not testify about a patient's statements of pain, subjective symptoms and history, although an exception to the hearsay rule allows a treating physician to state information obtained either from the patient or from outside sources for purposes of diagnosis and treatment. (*Jensen v. Elgin, Joliet & Eastern Ry. Co.* (1962), 24 Ill. 2d 383, 182 N.E.2d 211.) As best we can determine from the record, Dr. Cappitelli was an examining physician consulted solely for purposes of testifying at this trial. Hence, it was error to permit him to relate hearsay information obtained from the guardian and from Jackie. The fact that incompetent testimony by a physician was admitted does not justify a reversal where the testimony was merely corroborative of matters established by other testimony. (*Hastings v. Abernathy Taxi Association, Inc.* (1973), 16 Ill. App. 3d 671, 306 N.E.2d 498; *Becherer v. Best* (1966), 74 Ill. App. 2d 174, 219 N.E.2d 371.) Here, one of the foster parents testified without objection about Jackie's nightmares, and several witnesses described the scars that appeared to be burn marks on the boys' bodies. Dr. Cappitelli's conclusion that the children had been abused was expressly stated to be based upon his examination. Furthermore, in a trial without a jury, error in admitting incompetent testimony will be regarded as harmless if there is sufficient competent evidence to sustain the judgment of the court. (*McFail v. Braden* (1960), 19 Ill. 2d 108, 166 N.E.2d 46.) Such, we believe, is the case here.

■■ The second claim of improperly admitted hearsay evidence concerns testimony of Henry Pierson, the DCFS social worker, when he stated that he first learned about the Wheeler family from an anonymous telephone call informing him that the children were begging food from the neighbors and were not being properly supervised. Pierson also testified that Mr. Wheeler told him that Jackie often went begging for food and that he had abused his wife and Jackie frequently when he got drunk while they lived in Peoria. This latter testimony was, as the trial court ruled, an admission by a party-opponent and was properly received in evidence. (*Woodruff v. Pennsylvania R.R. Co.* (1964), 52 Ill. App. 2d 341, 202 N.E.2d 113.) As to the anonymous telephone call, the fact that a complaint was made to DCFS was admissible to show why an investigation of the family was undertaken but not to prove the truth of the anonymous allegations. (*People ex rel. Jones v. Jones* (1976), 39 Ill. App. 3d 821, 350 N.E.2d 826.) In any event, considering that the father admitted that Jackie begged others for food, we fail to see how the testimony relating the anonymous call could have been prejudicial. We find no error.

Finally, the parents claim that the evidence was insufficient to establish that Jackie was neglected, if his incompetent *in camera* testimony is disregarded, and therefore, as to him, the termination of

parental rights should be reversed. This argument overlooks the evidence that Jackie was burned on his penis by his father, that the condition of the family home was unsanitary and filthy, that the children were unclean and undernourished, and that Jackie appeared to need special educational and emotional help which his parents either could not or would not provide. The record contains ample competent evidence to support the termination of parental rights as to Jackie, as well as to Robin and Tina.

Unlike those cases where the State has acted precipitously to terminate parental rights, this case is one where DCFS tried to help the parents over a period of several years, and as a result, the Wheeler children suffered the horrors of an extended time in an environment that was not only deprived but depraved. That the parents have failed all efforts to bring about their rehabilitation was established by competent evidence that was clear and convincing, and so we affirm the orders of the Circuit Court of Fulton County.

Affirmed.

STOUDER and BARRY, JJ., concur.