AUGUST CAPONI, Indiv., and as Special Adm'r of the Estate of Antoinette Caponi, Deceased, Plaintiffs-Appellees, v. LARRY'S 66 *et al.*, Defendants-Appellants.

Second District No. 2—91—1325

Opinion filed October 8, 1992.—Rehearing denied November 19, 1992.

Suzanne Favia, of Fraterrigo, Best & Beranek, of Wheaton, and Fraterrigo, Best & Beranek, of Chicago (James F. Best, of counsel), for appellants.

Kenneth J. Cortesi, of Chicago, and H. Evan Williams IV, of McKenna, Storer, Rowe, White & Farrug, Kralovec, Marquard, Doyle & Gibbons, Chartered, and Frank E. Jeffers III, all of Wheaton (Paul J. Bargiel, of counsel), for appellees.

JUSTICE NICKELS delivered the opinion of the court:

In this negligence action, the circuit court struck defendants' expert's deposition testimony as an impermissible contradiction of Lawrence Wegrzyn's (Larry's) judicial admissions during his deposition. The circuit court then granted partial summary judgment on the issue of liability in favor of plaintiff, August Caponi, as administrator of the estate of his wife, Antoinette Caponi (Antoinette's estate), and against defendant, Bernice Wegrzyn, as the special administrator of the estate of her husband, Larry. At this juncture, we note for clarification that Larry died during the pendency of these proceedings from natural causes unrelated to the accident, and his wife was substituted as a party as his special administrator. However, Larry was extensively deposed, and such testimony is central to our consideration of the issues now before us. Therefore, for ease of reference, we will continue to refer to Larry rather than Bernice Wegrzyn as special administrator for Lawrence Wegrzyn.

On defendants' motion, the circuit court then excluded all issues of liability from the trial as to all parties and, on the court's own motion, additionally entered summary judgment for August Caponi, individually (August), against Larry and defendants Larry's 66 (repair shop) and Wayne Wegrzyn (Wayne), who was Larry's son and partner in the repair shop. Before trial, defendants filed a motion *in limine* to prevent plaintiffs from calling witnesses to establish Larry's agency for Wayne and the repair shop on the issue of their liability to Antoinette's estate, who was the only plaintiff for whom liability remained an issue. The court ruled that liability had been established but neglected to expressly indicate that such ruling was in favor of Antoinette's estate. After the trial limited to the issue of damages, the jury returned verdicts in favor of Antoinette's estate and in favor of August and against all defendants. The circuit court thereafter entered an order *nunc pro tunc* correcting its pretrial ruling on defendants' motion *in limine* to reflect that the entry of summary judgment on the issue of liability had been in favor of Antoinette's estate.

Defendants appeal, asserting that: (1) the court erred in finding Larry's deposition testimony that the brakes were "high and hard" was a judicial admission, which precluded contradiction by defendants'

expert and which established Larry's negligence as a matter of law; (2) that the circuit court abused its discretion in entering its *nunc pro tunc* order because the record of its pretrial ruling did not support such correction; and (3) that the trial court made erroneous and prejudicial evidentiary rulings during the trial on the remaining issue of damages, which require reversal and remand for a new trial.

Larry was an auto mechanic for 35 years and owned and operated the repair shop in partnership with Wayne. On July 16, 1987, a customer brought in a 1966 Ford Thunderbird for repairs. The owners complained that the Thunderbird shook and shuddered when idling and that, although it did not, the engine felt as if it would die out or stall. Defendants had performed all mechanical repairs on the Thunderbird for approximately 15 years.

Although the engine of the Thunderbird did not stall during a test drive by Wayne, he determined that it needed carburetor repairs and that the cause of the complaints was too much gas entering the carburetor, which caused "loading up and flooding out" of the carburetor. At his deposition, Larry testified that "loading up and flooding out" referred to the float on the carburetor letting in too much gas when a car idles, which chokes out the proper amount of air and can cause the engine to stall. Plaintiffs' expert also testified that sudden hard acceleration from a stopped, idling position can inject additional gas into the already flooded carburetor, which may also cause the engine to stall. However, Larry testified that a rough idle caused by carburetor problems has no effect once a car reaches a speed of 10 miles per hour.

Wayne advised Larry of his diagnosis of the problem and asked him to also drive the Thunderbird to confirm such diagnosis. After completing some paper work at the repair shop at approximately 1 p.m., Larry test drove the car by using it to run some business-related errands. He, too, experienced a rough idle on several occasions when stopped at traffic lights and also reached the conclusion that the carburetor needed repairs. During Larry's test drive prior to the collision, however, the engine of the Thunderbird did not stall, and it ran smoothly at times other than when idling. As he continued to complete his errands, Larry was travelling eastbound in the curb lane on Lake Street in Addison, which is a four-lane roadway with two lanes of traffic travelling in each direction. After waiting at the stoplight at the intersection of Lake Street and Addison Road, Larry began to proceed. After about 2½ blocks, he noticed traffic slowing in the curb lane due to traffic leaving the roadway. The speed limit was 30 miles per hour, but Larry had only reached a speed of 20 miles per hour

when the traffic began to slow further. Larry removed his foot from the accelerator, and, after checking traffic and turning on his left turn signal, Larry began to accelerate into the inside lane to go around the slowing traffic. However, another car in the inside eastbound lane was stopped waiting to make a left turn several car lengths in front of the point where Larry began to enter the inside lane. Therefore, approximately half way through the maneuver into the inside lane, Larry applied his brakes only to find that they were, according to his deposition testimony, solid or "hard" and that he could not depress the pedal, which may be described as "high." Larry attempted to steer the Thunderbird back into the curb lane, but had no steering as well. Based on the high, hard brake pedal and loss of steering, Larry came to the conclusion after the collision that the engine of the Thunderbird had stalled, which he related to both the police and Wayne.

The Thunderbird continued on its last trajectory towards the inside lane and across it, eventually crossing the double yellow lines separating the east and westbound lanes and entering the westbound lanes to strike the car driven by August and in which Antoinette was a passenger. Antoinette died as a result of the injuries she sustained, and August suffered injuries to his left arm, hip and knee, which required reconstructive surgery and which caused him pain and limited his activities after the collision. August, both individually and as administrator of Antoinette's estate, filed suit sounding in negligence naming as defendants Larry individually and, based on a theory of agency, Wayne and the repair shop.

Antoinette's estate moved for summary judgment against Larry on the issue of liability, arguing that because the accident occurred on the side of the double yellow line in which Antoinette was a passenger in a car, Larry was liable unless he could offer a nonnegligent explanation for his crossing such line. (See *Osborne v. O'Brien* (1986), 114 Ill. 2d 35, 41; see also *Sughero v. Jewel Tea Co.* (1967), 37 Ill. 2d 240, 242; *Calvetti v. Seipp* (1967), 37 Ill. 2d 596, 598-99.) In opposition to Antoinette's estate's motion, Larry asserted that a sudden emergency occurred when the brakes failed, which was a nonnegligent explanation for his conduct of crossing the double yellow line into oncoming traffic.

Both plaintiffs and defendants offered the deposition testimony of an expert to support their arguments for and against summary judgment respectively. Although they agreed on several key points, including the existence of a leak in one of the brakes lines that predated the collision, and both had discounted Larry's deposition testimony of a

high, hard brake pedal, the two experts reached conflicting conclusions on the cause of the collision.

Defendants' expert concluded that the preexisting hole in the brake line had caused a sudden, unanticipated catastrophic brake failure. However, both experts agreed that such catastrophic brake failure would be distinguished by the brake pedal going all the way to the floor. Thus, to reach his opinion, defendants' expert expressly ignored Larry's deposition testimony that the brake pedal was high and hard.

In contrast, plaintiffs' expert's opinion was that the hole in the brake line was only a small leak incapable of causing such catastrophic brake failure. In plaintiffs' expert's opinion, Larry had not experienced either a high, hard brake pedal or failure of the power steering because loss of engine power would not result in total loss of brakes and steering, but such power-assisted systems would gradually diminish to the equivalent of a system with manual steering and brakes. Therefore, in his opinion, the carburetor problem had nothing to do with the collision. However, in response to a specific request to accept Larry's description of the brake pedal, plaintiffs' expert admitted that a brake malfunction was possible due to contamination or shortage of the brake fluid caused by an improper seal of the cap of the master cylinder. Wayne had wired down the master cylinder cap in lieu of the factory-installed clamps in 1979. Plaintiff's expert further qualified this testimony with his opinion that the wiring of the master cylinder cap had nothing to do with the cause of the collision. Plaintiffs' expert concluded that no brake failure had occurred and that Larry had failed to apply the brakes.

Larry's deposition testimony included the following statements describing the brakes and steering at the time of the accident. "I hit the brakes, and I had a solid pedal. There was nothing. *** To my estimate there was no steering. I couldn't steer. And I know there was no brakes." In response to questions attempting to clarify this testimony, the following exchanges took place:

"Q. I believe your testimony was that at that point in time when you first stepped on the brake, you realized you had a hard pedal, correct?

A. That's right.

MR. CORTESI [Plaintiffs' attorney]: That's what I am was trying to get to, Jim.

MR. BEST [Defendants' attorney]: Fine; and then he said, I hit the brakes and had a solid pedal. There was nothing.

MR. CORTESI: I don't believe the word solid was ever used, and I think the word was hard.

MR. HANDLEY: The transcript will clear that up.

MR. CORTESI: I want to ask him to amplify on what he means by a hard pedal. I don't remember solid pedal being—

MR. BEST: Page 185, I hit the brakes; and I had a solid pedal. There was nothing.

MR. CORTESI: Where is that at, Jim?

MR. BEST: Page 185, lines 15 to 16.

BY MR. CORTESI:

Q. Okay. Then, the reference I was making to—and I will find it—it's a hard pedal, and I will just ask him what he means by—

MR. BEST: And I don't know if he—

MR. HANDLEY [Attorney for owners of the Thunderbird]: You might want to ask him what he means by both?

MR. BEST: They might mean the same.

MR. CORTESI: Right. I got it here somewhere, but—

MR. BEST: I don't see that as a big deal.

MR. CORTESI: Okay. Fine.

BY MR. CORTESI:

Q. In your mind, do solid pedal and hard pedal mean the same thing?

BY THE WITNESS:

A. Yes.

Q. Okay. Could you explain in greater detail what you mean or understand solid pedal or hard pedal to mean?

A. Well, I meant that I couldn't push the brake pedal down at all.

Q. Anything else?

A. No.

Q. When you say you couldn't push the brake pedal down at all, does that mean because the brake pedal was all the way to the floor; or does that mean the brake pedal was still on high and wouldn't move?

A. It was all the way to the top and wouldn't move.

Q. What do you mean by top?

A. It wouldn't go down.

Q. It wouldn't go down?

A. It wouldn't go down.

\* \* \*

Q. Okay. And both of your hands were on the wheel?

A. Yes, sir.
Q. At three and at nine o'clock?
A. Right.
Q. Did the steering wheel move at all?
A. No.
Q. Was it frozen?
A. To the point you couldn't move it."

At his deposition, Larry also testified that prior to taking the Thunderbird for a test drive, he was aware that it had a carburetor problem that Wayne had diagnosed as causing it to "load up and flood out" and that Larry himself had seen gas dripping from the carburetor. Larry testified that such problem could cause the Thunderbird to die out, which would result in the car losing its brakes and steering. Although Larry testified that, in his opinion, it was dangerous to drive a car that might die out, the engine of the Thunderbird had not died during any of the times it was driven by its owners, Wayne, or Larry despite its carburetor problems. Both Wayne and plaintiffs' expert offered an opinion that it is reasonable and proper for a mechanic to test drive a car with a carburetor problem if the engine is not dying out.

In response to Larry's opposition to his motion for summary judgment, Antoinette's estate moved to strike defendants' expert's testimony as an impermissible contradiction of Larry's judicial admission that the brake pedal was high and hard immediately before the accident. Therefore, on July 27, 1990, the circuit court granted Antoinette's estate's motion to strike defendants' expert's testimony finding that Larry's testimony that the brake pedal was high and hard was a judicial admission that could not be contradicted by expert testimony. The court also granted Antoinette's estate's motion for summary judgment finding that, despite Larry's testimony of brake failure, he was negligent in driving the Thunderbird because he knew its engine might stall and that the brakes and steering would fail as a result. Therefore, the brake failure was not a nonnegligent explanation for the accident.

The motion for summary judgment had been directed only to the liability of one defendant as to one plaintiff. Based on that finding of liability, however, defendants moved to limit the issues at trial to only that of damages as to all plaintiffs and all defendants and, for purposes of the such motion, admitted both agency and lack of any contributory negligence on the part of either August or Antoinette. The court granted defendants' motion on August 21, 1990, in an order that referred only to "August Caponi, Individually," but its accompa-

nying letter of opinion explained that order granted the defendants' motion to limit the issues at trial to the damages claimed by "August Caponi, Individually and the Estate of Antoinette Caponi against Larry's 66, the Estate of Lawrence Wegrzyn and Wayne Wegrzyn."

Several months later in November 1990, the circuit court on its own motion entered an order granting summary judgment on the issue of liability in favor of "August Caponi." The letter of opinion that accompanied that order expressly noted that it was based on defendants' prior motion to limit the issues at trial to only damages as to all plaintiffs and all defendants.

On May 20, 1991, during a hearing on defendants' pretrial motion *in limine*, defendants sought to bar Wayne and Bernice Wegrzyn from testifying as adverse witnesses on the question of agency and expressly relied on the court's ruling limiting the case to the issue of damages only. Plaintiffs responded by noting that the court had not ruled on the issue of liability as to "Mr. Caponi against Wayne Wegrzyn and Larry's 66" and the need, therefore, to establish agency as to those two defendants. Defendants responded that agency had been admitted, and the circuit court ruled finding "liability against Larry's 66 and also against Wayne Wegrzyn." The circuit court therefore granted that portion of defendants' motion *in limine* and barred Wayne and Bernice Wegrzyn from testifying as adverse witnesses at the trial, which proceeded on the sole issue of damages.

The circuit court denied the balance of defendants' motion *in limine* seeking to exclude certain evidence and in the course of the trial overruled defendants' objections to such evidence. The objected-to evidence included the introduction of a wedding picture of August and Antoinette, the testimony of the attending physician at the scene that other emergency personnel told her that Antoinette was conscious immediately following the accident, the testimony of August's son-in-law that August could no longer perform services for his daughter and son-in-law as August had prior to the accident, and August's testimony that an unidentified hospital or emergency personnel said "we got you back" to August when he regained consciousness and August's response to that statement. In addition, the court sustained defendants' objection to August's testimony that if he had the chance, the last thing he would have told his wife was that he loved her. Finally, the court overruled defendants' objection to plaintiffs' rebuttal during closing arguments. Defendants had argued during their closing argument that this was a case of mature individuals and, therefore, the duration of damages was shorter. Defendants argued that this was not the type of case in which August, who was retired,

had lost his career or ability to support himself, did not face a lot of medical bills in the future due to his mature age, and still had remaining family despite the loss of his wife. Defendants argued that Antoinette, whose children were adults, was not a mother of young children deprived of guidance and upbringing. In rebuttal plaintiffs were permitted to argue over defendants' objection that it was ridiculous to assert that an older person's pain and suffering was less than somebody else's and that life becomes more, rather than less, valuable as one gets older. The jury returned verdicts for Antoinette's estate in the amount of $581,096.66, which included $75,000 for pain and suffering, and for August, individually, in the amount of $471,501.50, including $190,000 for disability, $195,000 for pain and suffering, and $10,000 for disfigurement.

In a post-trial motion, defendants pointed out a potential ambiguity in the circuit court's July 27, 1990, order which granted summary judgment on the issue of liability to Antoinette's estate against Bernice Wegrzyn as special administrator for her husband's estate, and its May 20, 1991, pretrial ruling, which granted summary judgment on the issue of "liability against Larry's 66 and also against Wayne Wegrzyn" without identifying Mr. Caponi's capacity as administrator of Antoinette's estate. Before responding to such motion, plaintiffs moved to supplement the record to amend those rulings. The court granted plaintiffs' motion and specifically amended its July 27, 1990, order to reflect that summary judgment had been entered in favor of Antoinette's estate against Bernice Wegrzyn as special administrator for her husband's estate and amended its May 20, 1991, ruling to reflect that summary judgment was granted in favor of Antoinette's estate against Wayne and the repair shop.

Defendants appeal and assert that: (1) the circuit court erred in finding Larry's deposition testimony that the brake pedal was high and hard was a judicial admission, which precluded contradiction by defendants' expert, and which further required summary judgment against Larry on the issue of liability because such judicial admission established that there was no nonnegligent explanation for Larry's crossing the double yellow line as a matter of law; (2) the record of the circuit court's May 20, 1991, ruling contained no error susceptible to correction *nunc pro tunc*; and (3) the circuit court abused its discretion making certain evidentiary rulings to defendants' prejudice, which require reversal and remand for a new trial on the issue of damages.

The purpose of a motion for summary judgment is not to try a question of fact, but rather to determine if a question of fact exists.

(*Addison v. Whittenberg* (1988), 124 Ill. 2d 287, 294.) It is proper when, construing the evidence in the record strongly against the movant and liberally in favor of the opponent (*In re Estate of Whittington* (1985), 107 Ill. 2d 169, 177; *Dockery v. Ortiz* (1989), 185 Ill. App. 3d 296, 304-05), the pleadings, depositions, and affidavits demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005(c); *Vuletich v. United States Steel Corp.* (1987), 117 Ill. 2d 417, 421; *Hagy v. McHenry County Conservation District* (1989), 190 Ill. App. 3d 833, 842). To prevent entry of summary judgment, an opponent must present a *bona fide* factual issue and not merely general denials and conclusions of law. (*Wil-Shore Motor Sales, Inc. v. Continental Illinois Bank & Trust Co.* (1984), 130 Ill. App. 3d 167, 172.) An issue is "genuine" only if there is evidence to support the position of the nonmoving party. (*N.W. v. Amalgamated Trust & Savings Bank* (1990), 196 Ill. App. 3d 1066, 1075.) Thus, although the party opposing summary judgment need not prove his case at this preliminary stage, he must present some factual basis that would arguably entitle him to a judgment under the applicable law. *Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 939.

If there is no dispute as to any material fact and the undisputed facts permit but one inference, it is only the legal effect of such facts that is at issue, and a court should grant summary judgment. (*First State Bank v. Busse* (1984), 126 Ill. App. 3d 577, 580; *Dockery*, 185 Ill. App. 3d at 305; *Vincent DeVito, Inc. v. Vollmar Clay Products Co.* (1989), 179 Ill. App. 3d 325, 327.) The circuit court may grant summary judgment on such undisputed facts only if all the evidence, viewed in the light most favorable to the nonmovant, permits no inferences from which different conclusions may be drawn and with which no reasonable person could disagree. *Dockery*, 185 Ill. App. 3d at 305.

The propriety of the court's grant of summary judgment on the issue of liability in favor of Antoinette's estate requires an analysis of several steps. First, we must determine if the circuit court properly determined as a matter of law that Larry's deposition testimony was a judicial admission, which could not be contradicted by defendants' expert's testimony and which therefore required striking such testimony. Second, if Larry's description of the brake pedal and steering immediately prior to the accident was a judicial admission, did the circuit court properly find such undisputed facts permitted but one inference from which reasonable persons could reach but one conclusion

(see *Dockery*, 185 Ill. App. 3d at 305), which was a finding of liability against Larry.

■■ ■ "A judicial admission is a deliberate, clear, unequivocal statement of a party about a concrete fact within that party's peculiar knowledge." (*Hansen v. Ruby Construction Co.* (1987), 155 Ill. App. 3d 475, 480; see also *McCormack v. Haan* (1960), 20 Ill. 2d 75, 78-79.) It must concern a concrete fact and not be merely a matter of inference, opinion, estimate, or uncertain memory (*Hanson v. Darby* (1968), 100 Ill. App. 2d 339, 348), and such admission of fact carries with it an admission of other facts necessarily implied from it (*Dixon v. City of Chicago* (1981), 101 Ill. App. 3d 453, 455). A judicial admission may not be contradicted and is binding upon the party making such admission. (*Lindenmier v. City of Rockford* (1987), 156 Ill. App. 3d 76, 87.) Although statements made during a discovery deposition are normally treated only as evidentiary admissions, which may be contradicted, such statements may be "so deliberate, detailed, and unequivocal, as to matters with the party's personal knowledge" that the statements will be held to be judicial admissions. (*Lindenmier*, 156 Ill. App. 3d at 87.) A party may contradict a judicial admission neither with his own contrary testimony nor that of other occurrence witnesses or experts. (*Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1979), 71 Ill. App. 3d 562, 568 (party's own affidavit contradicting deposition testimony); *Hansen*, 155 Ill. App. 3d at 479 (same); *Hansen v. Ruby Construction Co.* (1988), 164 Ill. App. 3d 884, 888 (contradictory affidavit of occurrence witness).) The determination of whether a party's statement is sufficiently unequivocal to be considered a judicial admission is a question of law. *Hansen*, 155 Ill. App. 3d at 480-81.

■■ In this instance, Larry not only testified that he had a "solid" brake pedal, but when asked to explain what that description meant, repeatedly elucidated that the brake pedal was all the way to the top and would not move down at all and that he had his foot on the brake pedal the entire time trying to depress it. There was no equivocation in Larry's testimony, and the condition of the brake pedal before the collision was not an opinion, estimate, or inference, but rather was an observed fact solely within Larry's knowledge. (See *Hanson*, 100 Ill. App. 2d at 348.) Thus, Larry's testimony was "a deliberate, clear, unequivocal statement *** about a concrete fact" and was a judicial admission. See *Hansen*, 155 Ill. App. 3d at 480.

Defendants urge, however, that we adopt the reasoning of the Appellate Court, Fifth District, in *Brummet v. Farel* (1991), 217 Ill. App. 3d 264, which created a "swiftly moving events" exception to the ju-

dicial admission rule. In *Brummet*, the plaintiff was a passenger in the truck driven by his father, who was a defendant, when it collided head-on with another car driven by a second defendant. The father moved for summary judgment based on the plaintiff's deposition testimony that the father never crossed the center line. Plaintiff offered in opposition the deposition of the second driver, who testified that it was the father who had crossed the center line. The appellate court majority found that the fluid event of a fast-moving car wreck was a situation in which mistake was likely. Therefore, despite the unequivocal testimony of the plaintiff, the likelihood of such mistake rendered the plaintiff's statements equivocal and an exception to the judicial admission rule. *Brummet*, 217 Ill. App. 3d at 268-69.

However, we find that *Brummet* can be distinguished on the basis of its unique facts, which the Appellate Court, Fifth District, discussed in detail, rather than application of a swiftly moving events exception. In *Brummet*, the two defendants had antagonistic interests, and the contradictory testimony was that of opposing parties, each of whom was an occurrence witness. (*Brummet*, 217 Ill. App. 3d at 265-66.) In contrast, in this instance, the contradictory testimony is neither that of a party, nor is it even the testimony of an occurrence witness, but rather is that of an expert attempting to determine the cause of the collision after the fact. Similarly, the only support for the majority's opinion in *Brummet* also concerned the testimony of a plaintiff passenger seeking damages from both the driver of the car in which she was riding and from the driver of the other car involved in the collision. (*McCormack*, 20 Ill. 2d at 77.) However, the supreme court in *McCormack* did not create a swiftly moving events exception, but rather merely recognized that whether a party's statement may be deemed a judicial admission depends on the totality of the party's testimony and the contradictory *occurrence* testimony of other *parties*. (*McCormack*, 20 Ill. 2d at 78-79.) In contrast in this instance, defendants' expert was not a party who was a witness to the events.

We may similarly dispose of the remaining authority cited by defendants to support their argument that Larry's statements describing the brake pedal were not judicial admissions. In *Misch v. Meadows Mennonite Home* (1983), 114 Ill. App. 3d 792, the plaintiff was asked the distance travelled between the time she activated her turn signal and the time she began a turning maneuver. (*Misch*, 114 Ill. App. 3d at 801-02.) Although distance can be a concrete fact if it has been ascertained using a ruler or tape measure, all distances are merely estimates without the use of such instruments, and an esti-

mate may not be a judicial admission. *Hanson*, 100 Ill. App. 2d at 348.

In *Stambaugh v. International Harvester Co.* (1982), 106 Ill. App. 3d 1, the plaintiff testified that the securely fastened gas cap on his farm tractor had blown off, which was corroborated by the testimony of other farmers but which all of the experts, including the plaintiff's own experts, testified was impossible if the cap was in fact securely fastened. (*Stambaugh*, 106 Ill. App. 3d at 19-20, *rev'd on other grounds* (1984), 102 Ill. 2d 250.) However, the plaintiff did not offer the testimony of his experts to contradict his alleged judicial admission, but rather the *defendant* urged the experts' opinions in contradiction of the *plaintiff's* testimony. Thus, the application of the rule barring contradiction by a party of the party's own judicial admission was not at issue. Moreover, the plaintiff's expert's opinion was not a judicial admission and could be controverted by the plaintiff's own testimony of concrete facts.

In this instance, the circuit court was correct in finding as a matter of law that Larry's deposition testimony that the brake pedal of the Thunderbird was high and hard was a judicial admission and in striking the opinion of defendants' expert, who had expressly disregarded and contradicted such judicial admission. However, we must now consider the second step in our analysis and determine the effect of such judicial admission on the circuit court's grant of summary judgment in favor of Antoinette's estate and against Larry.

■ Absent some evidence of a nonnegligent explanation for the defendant's conduct, a collision between a vehicle occupied by the plaintiff passenger with one driven by the defendant that occurs on the plaintiff's side of the highway establishes the defendant's liability as a matter of law. (See *Osborne v. O'Brien* (1981), 114 Ill. 2d 35, 41; see also *Sughero*, 37 Ill. 2d at 242; *Calvetti*, 37 Ill. 2d at 598-99.) Thus, the question presented is whether defendants adduced some evidence of a nonnegligent explanation for Larry's conduct in crossing the double yellow line and entering the lane of oncoming traffic in which August and Antoinette were driving.

In granting Antoinette's estate's motion for summary judgment, the circuit court accepted Larry's deposition testimony the brakes and steering of the Thunderbird failed and that such failure was caused by the stalling of the engine during Larry's test drive. The circuit court then concluded that Larry's knowledge that a carburetor problem may cause stalling and further acknowledgement that it is dangerous to drive a car with an engine that will stall made such test drive negligent. However, the uncontradicted evidence is that the first and only

time the engine of the Thunderbird stalled was immediately prior to the collision. Wayne testified that the car had not stalled during his test drive and that the owners had not experienced stalling despite the carburetor problems. Wayne's affidavit recited that it is reasonable and proper to test drive a car with a carburetor problem if it is not stalling. Even plaintiffs' own expert agreed that if a mechanic was confident that a car with a carburetor problem would not stall, a test drive was proper.

■ Construing the inferences from these undisputed facts in favor of the nonmovant, a reasonable jury could have concluded that, despite the Thunderbird's carburetor problems, Larry had no reason to believe that it would stall and that the resultant brake failure was not due to Larry's negligence. Thus, the trial court erred as a matter of law in finding that Larry had failed to offer some evidence of a nonnegligent explanation for crossing into the plaintiffs' lane of traffic and in granting Antoinette's estate's motion for summary judgment on the issue of liability.

In light of our resolution of this issue, we need not consider the propriety of the circuit court's *nunc pro tunc* order correcting the record of its ruling on defendants' motion *in limine*. However, because the evidentiary errors raised on appeal are likely to recur on remand, we address such of defendants' objections to the admission of evidence as the circuit court overruled. We also note that the admissibility of evidence is committed to the sound discretion of the circuit court (*Gilman v. Kessler* (1989), 192 Ill. App. 3d 630, 647) and consider such alleged errors within the confines of that standard of review.

■ Defendants first assert that the circuit court erred in admitting the wedding photograph of August and Antoinette because it was irrelevant and prejudicial. The circuit court allowed the photograph as evidence of the origin of the marriage relationship of August and Antoinette.

The relevance of a photograph is established where it tends to prove a matter in controversy. (*Bullard v. Barnes* (1984), 102 Ill. 2d 505, 519.) In claims for loss of society, our supreme court has approved the depiction of a decedent's relationships through the use of photographs or videos. (*Drews v. Gobel Freight Lines, Inc.* (1991), 144 Ill. 2d 84, 89; see also *Barenbrugge v. Rich* (1986), 141 Ill. App. 3d 1046, 1056.) If a photograph has sufficient probative value, even if inflammatory or prejudicial, it should be admitted, and the decision whether a photograph's probative value outweighs its prejudicial effect rests within the sound discretion of the circuit court. (*Bullard,*

102 Ill. 2d at 519.) If a photograph is relevant and probative, it is not inadmissible merely because it is cumulative. *Barenbrugge*, 141 Ill. App. 3d at 1056.

In this instance because August sought damages for the loss of Antoinette's society, the value of their relationship was at issue, and the wedding photograph was relevant to such relationship. Defendants assert that the age of the photo in this instance renders it distinguishable from the videos found admissible in *Drews*, which had been taken shortly before the plaintiff's decedent's death and which depicted his relationship with his wife and small sons. (*Drews*, 144 Ill. 2d at 89.) However, the value of Antoinette's society to August included the loss of emotional, intangible aspects including companionship, guidance, and felicity (*Elliot v. Willis* (1982), 92 Ill. 2d 530, 535; see also *Countryman v. County of Winnebago* (1985), 135 Ill. App. 3d 384, 388; *Brown v. Metzger* (1983), 118 Ill. App. 3d 855, *aff'd* (1984), 104 Ill. 2d 30), and the value of such elements is impacted by the duration of a relationship. We cannot say that the circuit court's determination that any prejudice from the wedding photograph was outweighed by its probative value in assisting the jury's determination of the value of August's relationship with Antoinette in this instance was error. See *Bullard*, 102 Ill. 2d at 519-20.

■ Defendants next objected to the admission of certain testimony as hearsay including Antoinette's statements to paramedics, which were testified to by an emergency-room physician who was called to the scene to treat Antoinette, and August's testimony of statements by an unidentified hospital employee made upon August's regaining consciousness at the hospital after the collision. Similarly, defendants assert that Antoinette's attending physician at the scene of the collision should not have been permitted to give an opinion on Antoinette's pain because such opinion was based on alleged hearsay evidence.

Hearsay evidence is in-court testimony of a statement made out of court, which is offered as an assertion of the truth of the matters contained in the statement and the value of which rests on the credibility of someone other than the witness. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121.) Statements offered not for the truth of the matter asserted, but rather for another purpose, are not hearsay. (*Smith v. Solfest* (1978), 65 Ill. App. 3d 779, 783.) Thus, out-of-court statements offered as evidence of an individual's state of mind or as evidence of "such other things as proof of a state of mind tends to establish" are not hearsay and are admissible. *City of Streator v. Industrial Comm'n* (1982), 92 Ill. 2d 353, 365.

The rule prohibiting admission of hearsay evidence is not absolute, and it is subject to many exceptions. (*City of Streator*, 92 Ill. 2d at 365.) Hearsay statements made under circumstances of stress are one exception to the bar against hearsay evidence because such statements are inherently reliable. (*In re Marriage of L.R.* (1990), 202 Ill. App. 3d 69, 80-81; *In re Wheeler* (1980), 86 Ill. App. 3d 564, 569.) However, such statement must be made while the declarant is under stress or excitement, prompted by an event or condition that caused such stress or excitement statement, and must relate to such event or condition. *In re Marriage of L.R.*, 202 Ill. App. 3d at 80-81.

Similarly, statements made to a physician for the purposes of treatment are an exception to the bar against hearsay evidence because an injured individual is presumed not to "prevaricate at the very instant of his injury or while he is stating his physical condition to a physician from whom he expects and hopes to receive medical aid, nor will he be presumed to feign disease, pain or distress under those conditions in which he is ordinarily observed by strangers." (*Greinke v. Chicago City Ry. Co.* (1908), 234 Ill. 564, 572; see also *Jensen v. Elgin, Joliet & Eastern Ry. Co.* (1962), 24 Ill. 2d 383, 388.) A physician may testify as to information received from the patient or from outside sources for such purposes of diagnosis. *In re Wheeler*, 86 Ill. App. 3d at 569; see also *Moore v. Bellamy* (1989), 183 Ill. App. 3d 110, 115 (excited utterance exception applied to statements of bystander).

Finally, an expert may give an opinion that will aid the fact finder in resolving a question of fact. (*Ketchum v. Dura-Bond Concrete, Inc.* (1989), 179 Ill. App. 3d 820.) To establish that a witness is an expert, it need only be shown that such witness, because of education, training or experience, possesses knowledge of a specialized nature beyond that of an average person. (134 Ill. 2d R. 220(a)(1); *Atkins v. Thapedi* (1988), 166 Ill. App. 3d 471, 475.) An expert may base his opinion on evidence, which is otherwise inadmissible hearsay, if such evidence is reasonably relied upon by experts in the field, and such evidence may be admitted as nonhearsay for the limited purpose of explaining the basis of an expert's opinion if the court in its discretion finds it otherwise meets the minimum standards of reliability. (*City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 185-86.) It can hardly be doubted that a physician is an expert on matters of trauma and injury and that physicians routinely rely on the information gathered by other medical personnel. Thus, a medical witness may offer an opinion that a condition or injury is capable of causing pain (see *Chicago, Burlington & Quincy R.R. Co. v. Martin* (1884), 112 Ill. 16), which may be based on

reliable statements by the patient describing symptoms to medical personnel other than the physician himself.

Antoinette's attending physician at the scene testified that, although Antoinette was unconscious at the time of the physician's arrival, paramedics told the physician that Antoinette was conscious for a period of time after the collision and complained of shortness of breath and abdominal and back pain. The physician also testified that the type of injury that Antoinette sustained, which was a rupture of the aorta, causes a "searing, boring, deep pain from the chest going through to the back." Such statements were not hearsay as to Antoinette's condition of consciousness because they were not offered for the truth of the matter asserted, but rather merely to show that Antoinette was conscious and capable of experiencing pain and suffering as claimed. As to the substance of Antoinette's complaints of pain and shortness of breath, such statements were subject to an exception to the hearsay rule as statements necessary for her medical treatment. Antoinette's statements to the paramedics, who were themselves medical personnel, describing the location and type of pain she was experiencing immediately after the collision were made with the expectation and hope of receiving medical aid. That those statements were then conveyed to the physician does not change the nature or inherent reliability of Antoinette's statements, or the purpose for which they were made, which was to receive treatment. Finally, defendants' assertion that Antoinette's physician could not offer an opinion that her injuries were capable of causing pain is blatantly without merit. It was not an abuse of discretion to admit the physician's recitation of the paramedics' statements describing Antoinette's condition as nonhearsay, the content of those statements as information necessary to the physician's diagnosis as an exception to the rule against hearsay, or the physician's expert opinion that Antoinette's injuries were capable of causing pain.

Similarly, August's testimony of statements made to him during his emergency treatment by unidentified medical personnel and his response thereto was not hearsay and was admissible. The court expressly allowed such testimony not for the truth of the matter asserted, but, rather, the statements were admitted for the limited purpose of demonstrating the effect of such statements on August's state of mind relative to his claim for pain and suffering. In addition, the statements by the unidentified hospital emergency staff member to August in the course of providing emergency treatment after a collision that had already resulted in one fatality were made under circumstances that did not permit reflection or rationalization. Thus,

such statements could also have been admitted under the excited utterance exception to the prohibition against hearsay evidence.

■ Defendants next assert that the circuit court abused its discretion in allowing irrelevant testimony by August's son-in-law. He described household projects with which August had helped prior to the collision, but which were of a type August could not perform after the collision. The court allowed such testimony as evidence of August's individual personal injury claim comparing what he could do before the collision with what he could do after. The restriction of August's abilities as a result of his injuries was relevant evidence of damages on his individual personal injury claim. (*Dillon v. U.S. Steel Corp.* (1987), 159 Ill. App. 3d 186, 202; *Reynolds v. Alton & Southern Ry. Co.* (1983), 115 Ill. App. 3d 88, 96.) Thus, there was no abuse of discretion in allowing such evidence.

■ Finally, defendants assert that the circuit court abused its discretion in overruling defendants' objection to plaintiffs' rebuttal argument, which asserted that the value of the pain and suffering of older individuals such as plaintiffs was no less than that of younger individuals. A defendant may not complain of prejudice created by argument in response to his own. (*In re Salmonella Litigation* (1990), 198 Ill. App. 3d 809, 821; *Crutchfield v. Meyer* (1953), 414 Ill. 210, 214.) In defendants' closing argument, they urged the jury to remember that August was not a wage earner in the flush of his career and that Antoinette was no longer the mother of small children needing her care. Defendants reminded the jury to consider the actuary tables estimating the life expectancy of both August and Antoinette as "older" individuals. Thus, defendants invited such rebuttal in emphasizing during their own closing argument the ages of August and Antoinette as a factor to be considered in determining damages.

The order of the trial court granting summary judgment to plaintiffs and against defendants on the issue of liability is reversed, and the cause is remanded.

Reversed and remanded.

BOWMAN and DOYLE, JJ., concur.