# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Sekerez v. Rush University Medical Center*, 2011 IL App (1st) 090889

---

| | |
|---|---|
| Appellate Court Caption | NADINE SEKEREZ, Special Administrator of the Estate of Zarko Sekerez, Deceased, Plaintiff-Appellant, v. RUSH UNIVERSITY MEDICAL CENTER, f/k/a Rush-Presbyterian-St. Luke's Medical Center; IRENE SILVA, DAVID SCHLIEBEN, JOANNA MAURICE, and JULIE WENDT, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket No. 1–09–0889 |
| Filed | June 30, 2011 |
| Rehearing denied | August 2, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a medical malpractice action alleging that defendants were negligent in administering Lovenox to a leukemia patient against his stated wishes, the entry of directed verdicts for defendants on the medical battery claims and the medical negligence claims was reversed and the cause was remanded for a new trial, since the evidence showed that defendants concluded that Lovenox was necessary due to decedent's breathing difficulty, but he had clearly refused Lovenox, there was no evidence that any later consent was sought from him or his family prior to the administration of Lovenox and the emergency exception did not apply, and with regard to the medical negligence claim, plaintiff presented sufficient expert testimony to establish a *prima facie* case of medical negligence on the part of defendant physician who initiated the Lovenox treatment, continued to administer it after defendant's refusal, and agreed to increase the dosage despite the fact that a CT scan did not support the continued course of treatment. |

| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2004–L–011047; the Hon. Donald J. Suriano, Judge, presiding. |

| Judgment | Reversed; cause remanded. |

| Counsel on Appeal | Kevin K. McQuillan, of McQuillan Law Office, of Naperville, for appellant. |
| | Anderson, Rasor & Partners, LLP, of Chicago (Robert B. Austin, Laura J. Ginnett, and Diane I. Jennings, of counsel), for appellees. |

| Panel | JUSTICE SALONE delivered the judgment of the court, with opinion. Justices Pucinski and Sterba concurred in the judgment and opinion. |

**OPINION**

¶ 1     Plaintiff, Nadine Sekerez, special administrator of the estate of the decedent, Zarko Sekerez, appeals from orders of the circuit court which: (a) granted a directed verdict in favor of defendants Rush University Medical Center, f/k/a Rush-Presbyterian-St. Luke's Medical Center (Rush), Dr. Irene Silva (Silva), Dr. David Schlieben (Schlieben), Dr. Joanna Maurice (Maurice), and Dr. Julie Wendt (Wendt), on medical battery; (b) granted a directed verdict in favor of Maurice on medical negligence; and (c) entered judgment on the jury's verdict on medical negligence in favor of Rush, Silva, Schlieben and Wendt. For the following reasons, we reverse and remand for a new trial.

¶ 2                        BACKGROUND

¶ 3                        Factual Background

¶ 4     In December of 1998, decedent was diagnosed with chronic lymphocytic leukemia (CLL), a terminal cancer. He underwent treatment and at times was hospitalized for illnesses relating to CLL. On June 20, 2001, decedent entered the emergency room at Rush complaining of constipation, dehydration and pain from shingles. Rush, a teaching hospital, uses a supervising doctor, the attending physician, to supervise the work of fellows, residents, and interns. The attending physician during the relevant times of decedent's

hospitalization was Dr. Silva. During that time, Dr. Silva supervised Drs. Maurice and Wendt, both interns, and Dr. Schlieben, a resident.

¶ 5 Decedent did not sign a general consent form for treatment upon his admission to Rush. However, during the time of his hospitalization, Rush had a general consent policy which stated in pertinent part:

"1. Purpose of Consent

Hospital personnel have a legal duty to refrain from treating the patient unless the treatment has been authorized by the patient. Similarly, the patient has a right to refuse to authorize treatment. A consent is obtained from a patient for treatment in order to protect the physician, the nurse, and the hospital against claims of unauthorized treatment. Any treatment or procedure which poses a risk to the patient should be authorized in writing after the risks and complications have been explained to the patient. A consent given by a patient after such an explanation is commonly referred to as 'informed consent.'

2. Verbal Consents

A patient may verbally consent to treatment or sign a consent form authorizing treatment. A verbal consent should be documented in the patient's medical record. Both a verbal and written consent are legally effective to authorize treatment; however, it is possible that a patient giving a verbal consent will later claim that he/she did not consent. Therefore, verbal consents may be accepted to authorize treatments posing no risk to the patient (e.g., routine diagnostic procedures, including physical examinations, the taking of blood samples, routine diagnostic x-rays and laboratory tests)."

¶ 6 After decedent was admitted to Rush, the doctors learned that he suffered from bacterial pneumonia. Decedent was subsequently placed in the respiratory care unit, a division of the intensive care unit. Drs. Maurice and Schlieben examined decedent after his admission. They were aware that decedent had various risk factors which made him more susceptible to the development of deep vein thrombosis (DVT) including his age, terminal cancer diagnosis, high white blood cell count, multiple infections and the fact that his illnesses confined him to bed. Dr. Maurice prescribed Lovenox, a blood thinner, to guard against DVT. She wrote the order for a 30-milligram preventative dose, to be administered intravenously twice per day.

¶ 7 Decedent received the first dose of Lovenox on June 21, 2001, at 6 a.m. Approximately one hour later, a nurse noted in decedent's chart that he stated "I don't need blood thinners." The nurse further noted in decedent's chart that Dr. Maurice was notified of the patient's refusal of treatment. At that juncture, the Lovenox treatment was discontinued and decedent did not receive any further injections of Lovenox.

¶ 8 A chest CT scan was taken the following day at approximately 6:30 p.m., and there was no evidence of pulmonary embolism (PE)[1]. On June 22, 2001, a nurse informed Dr. Wendt,

---

[1]Pulmonary embolism occurs when one or more arteries in the lungs become blocked; in most cases PE is caused by blood clots that travel to the lungs from another part of the body, most

-3-

who was the doctor on call, that decedent's oxygen levels were decreasing. In response, Dr. Wendt placed the decedent on 100% oxygen, but his breathing remained distressed. She then ordered that decedent be placed on BiPap, a noninvasive ventilation treatment. Dr. Wendt subsequently discontinued the order for 30 milligrams of Lovenox and entered a new order for a twice daily dose of 70 milligrams, which was a therapeutic dose. Pursuant to Dr. Wendt's order, decedent received 70 milligrams of Lovenox at 10 a.m. and a second dose at 9 p.m. According to defendants, decedent's creatine clearance level was calculated prior to the Lovenox treatment and was always above 30.

¶ 9    The record indicates that Dr. Maurice left work at some point after she ordered the Lovenox treatment for decedent on June 21, 2001, and did not return until June 23, 2001. Upon her return, Dr. Maurice discussed decedent's treatment with Drs. Schlieben and Silva, and they agreed to continue the therapeutic dose of Lovenox. Thereafter, decedent received a dose of Lovenox at 9 a.m., but he refused the second dose. Decedent also refused Lovenox on June 24, 2001.

¶ 10   As the day passed, decedent's oxygen levels continued to worsen and his blood pressure dropped significantly. He became unresponsive and was intubated for breathing assistance. Decedent subsequently experienced a massive intracranial brain hemorrhage and Dr. Maurice reduced his Lovenox dosage to 40 milligrams once per day. An order was issued to discontinue the Lovenox on June 25, 2001. The decedent subsequently died on June 29, 2001.

¶ 11   The autopsy results revealed that decedent suffered from a cerebral hemorrhage caused by his invasive cancer and multiple infections that led to septic shock, respiratory failure and a drop in blood pressure. The autopsy results did not show that decedent suffered from PE.

¶ 12                              Procedural Background

¶ 13   On September 29, 2004, plaintiff filed a malpractice suit against Rush and each of the doctors individually, alleging that they were negligent in administering Lovenox against the decedent's stated wishes. Schlieben, Wendt and Maurice filed a motion for summary judgment on May 13, 2008, which the trial court denied. Motions *in limine* were also filed prior to trial, and the trial court subsequently barred the nurses' conduct as a triable issue. Several days before trial, plaintiff filed a motion to amend the complaint, seeking to add a claim for medical battery against all defendants based on a failure to obtain consent.

¶ 14   Defendants responded by filing a motion under section 2–615 of the Code of Civil Procedure (Code) (735 ILCS 5/2–615 (West 2008)) to dismiss the medical battery claims. The trial court denied the motion, and the case proceeded to trial. After opening statements, defendants renewed their motion to dismiss, which was again denied. The trial court subsequently entered a ruling that plaintiff could ask each doctor whether Rush's consent policy required a written consent for the administering of Lovenox. Defendants objected, arguing a violation under Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007), which the trial

---

commonly the legs (DVT).

court overruled. However, the trial court entered a ruling that defendants could "opine with all their witnesses that Rush's consent policy did not require a consent to administer Lovenox" over plaintiff's objection. The jury trial then commenced.

¶ 15                                    Trial Proceedings

¶ 16    Dr. Gerald Marti testified as an expert witness on plaintiff's behalf. He was hired by decedent's family to investigate the circumstances surrounding his death. Dr. Marti was not a board-certified physician, but was employed by the Food and Drug Administration. He opined that the Rush dosing card and the Physician's Desk Reference (PDR) established the standard of care for a patient in decedent's position. The purpose of the dosing card was to provide a guideline for doctors in calculating a patient's creatine clearance level, a measure of renal (kidney) functioning. The dosing card specifically provided guidelines for the administering of Lovenox and stated in relevant part:

> "The elimination and half-lives[2] of both dalterparin and enoxaparin (Lovenox) are prolonged in patients with renal insufficiency; this is most marked in patients with a calculated CrCl [creatine clearance] of 30 ml/min or less.
>
> * * *
>
> Therefore, the use of low molecular-weight heparin (Lovenox) in patients with a calculated creatine clearance of 30 milliliters per minute or less is not recommended."

¶ 17    In Dr. Marti's opinion, after review of the hospital records and autopsy report, the administering of the four doses of Lovenox was the proximate cause of decedent's death. In reaching this conclusion, he noted that because decedent's CT scan did not indicate PE, the Lovenox treatment was unwarranted. Dr. Marti also determined that defendants deviated from the standard of care because they continued to order and increase the dosage of Lovenox despite the fact that decedent's creatine clearance levels fell to or below 30. His calculation was based on his review of decedent's medical records. However, Dr. Marti indicated that Dr. Maurice's initial order for 30 milligrams of Lovenox was consistent with the standard of care and was not a proximate cause of decedent's death.

¶ 18    Each of the defendant doctors was then called as an adverse witness by plaintiff.

¶ 19    Dr. Maurice testified first. She acknowledged the existence of the dosing card at Rush and its purpose for setting guidelines for doctors in the administering of Lovenox. However, she admitted that although she ordered a Lovenox treatment for the decedent, his creatine clearance level was never calculated. Dr. Maurice further testified that there was a consent policy at Rush, and she explained that routine diagnostics, like blood draws and physical X-rays, could be performed with a patient's verbal consent. She then testified, however, that the administering of Lovenox did not require consent. Dr. Maurice read into evidence an excerpt from Rush's consent policy which explained the purpose of consent: "Hospital

---

[2]"Half-life" refers to the amount of time required for half the quantity of a drug or other substance deposited in a living organism to be metabolized or eliminated by normal biological processes.

personnel have a legal duty to refrain from treating the patient unless the treatment has been authorized by the patient. Similarly, the patient has a right to refuse to authorize treatment." Dr. Maurice admitted that there was no written or verbal consent in decedent's chart for the administering of Lovenox.

¶ 20    On cross-examination, Dr. Maurice testified that it was not customary practice and procedure at Rush to include the creatine clearance calculations in the patient's medical records. After examining the four separate doses of Lovenox that decedent received, she determined that his creatine clearance levels were never below 30. Dr. Maurice stated that she consulted with her supervisors before entering orders for Lovenox and other medications, and that she did not enter the last order for Lovenox. Dr. Maurice acknowledged that upon her return to work, several of the attending doctors asked her questions about the decedent.

¶ 21    Dr. Wendt testified next in plaintiff's case-in-chief. She testified that she commenced decedent's care after Dr. Maurice left work. Dr. Wendt ordered an increase in decedent's Lovenox dosage from 30 milligrams twice daily to 70 milligrams twice daily. Although it was noted in the medical records, Dr. Wendt stated that she was unaware that decedent had previously refused Lovenox. Additionally, she could not recall whether she reviewed decedent's CT scan which indicated no PE, but stated that she did not order another CT scan because of decedent's unstable condition.

¶ 22    Plaintiff then called Dr. Schlieben, who testified that on June 22, 2001, at approximately 7 a.m., he met with decedent. He further stated that his review of decedent's medical chart indicated that Dr. Wendt ordered an increase in the Lovenox dosage at 4:33 a.m. to be administered "stat." However, this treatment was not administered until 10 a.m. Dr. Schlieben admitted that he was aware of decedent's prior refusal of Lovenox and that decedent's CT scan did not indicate PE. He further testified that there are risks to administering Lovenox, including bleeding in the brain. Dr. Schlieben stated, however, that he calculated decedent's creatine clearance and it was above 30 prior to any adminstering of Lovenox.

¶ 23    Plaintiff next called Dr. Silva, who testified that, in her opinion, the standard of care for the issuance of Lovenox at Rush was to administer it as a treatment to patients who were admitted to the intensive care unit, were confined to bed, were older than 40 years old, and who were diagnosed with an underlying condition that carried a high risk for DVT. Rush and its doctors follow the dosing card for guidelines in administering Lovenox. Dr. Silva admitted that the CT scan taken on June 21, 2001, excluded the possibility of PE. She further indicated that a twice daily dose of 70 milligrams of Lovenox was a therapeutic or treatment dose while a twice daily dose of 30 or 40 milligrams was a preventative dose. Dr. Silva agreed with Dr. Wendt's order increasing the Lovenox dosage based on decedent's condition that morning, which included an increased difficulty in breathing. She further testified that she was not present for the initial order of Lovenox, but was responsible for continuing the treatment.

¶ 24    Plaintiff's counsel then attempted to question Dr. Silva as to whether decedent had been treated with Lovenox during a prior hospitalization. Defendants objected, arguing that Dr. Marti never opined that decedent's prior hospitalization was relevant in establishing the

standard of care and further that plaintiff was in violation of Rule 213. The trial court sustained the objection and told plaintiff's counsel to confine his questions to decedent's last hospitalization. A sidebar was held, and the trial court found that decedent's prior hospitalization was irrelevant in determining the standard of care for decedent's last hospitalization because it was not so indicated by plaintiff's expert witness. Plaintiff made no offer of proof as to the relevance of this evidence, but decedent's medical records from his prior hospitalization were later admitted into evidence.

¶ 25    Decedent's family members were called as witnesses, and they testified concerning decedent's quality of life. They identified photographs of decedent, and a total of seven photographs were admitted into evidence. Plaintiff's request to present a slide show presentation was denied. Plaintiff then rested her case-in-chief.

¶ 26    On September 24, 2008, defendants moved for a directed verdict on both the medical battery and medical negligence claims. Defendants argued that there was no affirmative act by the physicians to support the medical battery claims and plaintiff did not provide any evidence of lack of consent in her case-in-chief. As to the negligence claims, defendants argued that Dr. Maurice's initial prescription of Lovenox did not deviate from the standard of care per plaintiff's expert testimony. Defendants further argued that plaintiff failed to present evidence that Drs. Wendt and Schlieben violated the standard of care, and she only criticized Dr. Silva for administering Lovenox from a prior order.

¶ 27    Plaintiff requested time to respond because the motion contained incomplete legal and testimonial citations. The trial court denied plaintiff's request and subsequently heard oral arguments on defendants' motion. It subsequently entered a finding for a directed verdict in favor of all defendants on the medical battery claims, finding that plaintiff did not prove a *prima facie* case. The court further noted that there was no affirmative act or intent to harm by the defendant doctors, and at times, the act was approving the dosage that was already administered, thus not warranting a claim for medical battery. The court also entered a directed verdict for Dr. Maurice on the medical negligence claim, finding that she was not liable because there was no evidence that she ordered the 70-milligram dosage of Lovenox or had anything to do with the order as the "low person on the totem pole."

¶ 28    Trial proceeded solely on the medical negligence claims against Rush, Wendt, Schlieben and Silva, and defendants commenced their case-in-chief. In addition to the defendant doctors, defendants called several expert witnesses to testify on their behalf, namely: Dr. Todd Newberger, Dr. Joel Meyer, Dr. Steve Rosen, Dr. Michael Thirman, and Dr. James Fintel. Additionally, defendants presented the testimony of Dr. Stephanie Gregory, who was one of the first attending doctors who treated decedent after his CLL diagnosis.

¶ 29    Dr. Newberger testified that a general standard of care for all doctors is the way a reasonable physician would behave in similar situations. He opined that the defendant doctors met the standard of care in administering Lovenox, which was not a proximate cause of decedent's death. He further testified that the CT scan performed on June 21, 2001, was only indicative of the patient's condition at the time the scan was taken. Plaintiff objected based on a Rule 213 violation, which was overruled.

¶ 30    On cross-examination, plaintiff's counsel had Dr. Newberger read extensively from his

notes regarding the treatment of decedent at his last hospitalization. The trial court interjected, noting that plaintiff was not asking questions but merely publishing the notes to the jury. The court told plaintiff's counsel to admit the notes into evidence and to ask the witness a question.

¶ 31     Dr. Schlieben was called as a witness and stated that he was a nephrologist and kidney expert. Plaintiff objected because Dr. Schlieben acquired those qualifications after decedent's hospitalization and argued that they were not previously disclosed pursuant to Rule 213. The trial court overruled plaintiff's objection, noting that Schlieben was not testifying as an expert witness. Dr. Schlieben stated that decedent's creatine clearance level never reached 30. Plaintiff again objected based on a Rule 213 violation, which was overruled.

¶ 32     Subsequently on September 26, 2008, plaintiff filed a motion for mistrial, alleging that the trial court allowed certain testimony in violation of Rule 213, which resulted in severe prejudice. Specifically, plaintiff questioned the trial court's rulings which: (1) qualified Dr. Schlieben as a nephrologist/kidney expert; (2) allowed Dr. Newberger to testify regarding the CT scan report and dosing card, which he never reviewed, and previously undisclosed information regarding the condition of decedent's lungs at the time of the CT scan, and to opine that the June 21, 2001, CT scan was no longer a diagnostic tool in determining the presence of PE the following day; (3) allowed defendants to testify that decedent was too unstable to undergo another CT scan after 4:33 a.m. on June 22, 2001; (4) did not allow plaintiff to cross-examine defendants about decedent's prior hospitalization during her attempt to establish the standard of care for the administering of Lovenox; and (5) allowed the jury to hear the court's comments during plaintiff's cross-examination of Dr. Newberger that plaintiff's counsel's action of having the notes read was irrelevant and improper to impeach the witness.

¶ 33     The trial court denied the motion, finding that personal practice does not establish the standard of care, which must be shown through expert testimony. Regarding plaintiff's allegation that the trial court improperly commented during cross-examination of Dr. Newberger, the trial court stated: "There was an objection and I asked you the relevance of using the notes. *** [Y]ou dug your own hole. You see you lost this jury three or four days ago."

¶ 34     Defendants next called Dr. Robert Balk as an expert witness. He testified that decedent was a high risk patient for developing blood clots in the legs or the pulmonary artery, thus warranting the administering of Lovenox. He opined that decedent's worsening medical condition was unrelated to the initial dose of 30 milligrams of Lovenox because 4 1/2 hours is the amount of time for half of the dose to be eliminated from the body. Dr. Balk concluded that both the preventative and therapeutic doses of Lovenox were within the standard of care. Dr. Balk also stated that doctors at Rush administered Lovenox to decedent during his prior hospitalization.

¶ 35     On cross-examination, plaintiff's counsel asked Dr. Balk if the doctors present during decedent's prior hospitalization checked his creatine clearance before ordering a CT scan. Defendants' objection was sustained based on the trial court's earlier ruling.

¶ 36     Defendants then rested their case and requested a directed finding, which was denied.

The jury subsequently returned a verdict in favor of the remaining defendants on the medical negligence claims. After the denial of plaintiff's motion for a new trial, this timely appeal followed.

¶ 37                                    DISCUSSION

¶ 38        Plaintiff raises the following issues on appeal: (1) whether the trial court erred in granting a directed verdict in favor of all defendants based on lack of consent on the medical battery claim; (2) whether the trial court erred in granting a directed verdict in favor of Dr. Maurice on the medical negligence claim; (3) whether the trial court erred in allowing previously undisclosed testimony by defendants that Rush's consent policy did not apply to the administering of Lovenox in violation of Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007); (4) whether the trial court erred in not allowing plaintiff to present evidence or cross-examine defendants or their experts regarding (a) the standard of care for administering Lovenox and (b) the treatment of suspected PE during decedent's prior hospitalization; (5) whether the trial court improperly commented on the testimony elicited during cross-examination of defendants' experts; (6) whether the trial court erred in not allowing plaintiff to use additional photographs or a slide show presentation to depict decedent's relationships with his family as evidence for the loss of society claim or to "adequately depict decedent's true state of health"; (7) whether the trial court erred in not allowing plaintiff adequate time to review and respond to defendants' motions for directed verdict; (8) whether the trial court erred in allowing defendants and their experts to testify that the CT scan performed on June 21, 2001, was an improper diagnostic tool for determining if decedent should have received a preventative versus a therapeutic dose of Lovenox on the following day; (9) whether the trial court erred in qualifying Dr. Schlieben as a nephrologist/kidney expert and allowing him to testify to previously undisclosed opinions in violation of Supreme Court Rule 213 and the court's prior ruling *in limine*; (10) whether the trial court erred in allowing defense expert Dr. Todd Newberger to testify to previously undisclosed opinions in violation of Supreme Court Rule 213; (11) whether the trial court abused its discretion in denying plaintiff's written and oral motions for a mistrial and further by denying plaintiff's motion to bar evidence or to permit rebuttal due to defendant's numerous violations of Supreme Court Rule 213; and (12) whether plaintiff was denied a fair trial because of the cumulative effect of the trial court's rulings.

¶ 39                          Directed Verdict–Medical Battery

¶ 40        Plaintiff first contends that the trial court erred in granting a directed verdict in favor of defendants on her medical battery claims. Specifically, plaintiff maintains that decedent expressly refused the Lovenox treatment, which was documented in his medical chart. Additionally, plaintiff contends that defendants violated Rush's consent policy when they administered the Lovenox to decedent without consent.

¶ 41        This court reviews the entry of a directed verdict on a *de novo* basis. *Bermudez v. Martinez Trucking*, 343 Ill. App. 3d 25, 29 (2003). The trial court's entry of a directed verdict will be affirmed where the evidence, viewed in the light most favorable to the

-9-

plaintiff, so overwhelmingly favors the defendant that no contrary verdict based on that evidence could ever stand. *Saxton v. Toole*, 240 Ill. App. 3d 204, 210 (1992).

¶ 42   A battery is defined as the unauthorized touching of the person of another. *Curtis v. Jaskey*, 326 Ill. App. 3d 90, 93 (2001). At common law, a patient must consent before a physician renders medical treatment of any kind. *Curtis*, 326 Ill. App. 3d at 93.

¶ 43   The elements of a medical battery claim are: (1) an intentional act on the part of the defendant; (2) a resulting offensive contact with the plaintiff's person; and (3) a lack of consent to the defendant's conduct. *McNeil v. Brewer*, 304 Ill. App. 3d 1050, 1055 (1999). An "offensive contact" may be established by proof that the defendant intended to cause the plaintiff, directly or indirectly, to come into contact with a foreign substance in a manner which the plaintiff would reasonably regard as offensive. *McNeil*, 304 Ill. App. 3d at 1055. It is unnecessary for a plaintiff to establish hostile intent on the part of the defendant; rather, the gist of an action for battery is the absence of consent on the plaintiff's part. *Curtis*, 326 Ill. App. 3d at 94.

¶ 44   A corollary to the requirement that a patient's consent must be obtained prior to the performance of a medical procedure is that a patient is entitled to refuse medical treatment. *Curtis*, 326 Ill. App. 3d at 94. In fact, absent consent, a patient cannot be compelled to submit to a medical procedure even where the patient's life is in jeopardy. *Curtis*, 326 Ill. App. 3d at 94.

¶ 45   Turning to the instant case, we find that the intentional acts for purposes of plaintiff's medical battery claims were the entry of the various orders to administer Lovenox, and the resulting "offensive" contact was the actual administering of the Lovenox to decedent. The remaining dispute then centers on the final element, lack of consent.

¶ 46   It is evident from the record that decedent expressly refused Lovenox at least three times. The first refusal occurred one hour after receiving the initial 30-milligram dose ordered by Dr. Maurice on June 21, 2001. He again refused Lovenox on June 23 and 24, 2001. According to the record, it was noted in decedent's chart on June 21, 2001, that he had expressly refused Lovenox and that Dr. Maurice was notified of his refusal. Moreover, each of the defendant doctors, with the exception of Dr. Wendt, testified that decedent refused the Lovenox. Conversely, Dr. Wendt testified that she was unaware of decedent's refusal of treatment. We are unpersuaded by Dr. Wendt's assertions because it was easily discoverable upon a review of decedent's medical chart. Additionally, although previously notified of decedent's refusal of Lovenox, Dr. Maurice subsequently met with Drs. Wendt and Schlieben concerning decedent and they collectively agreed to increase the Lovenox dosage to 70 milligrams twice daily. The record does not indicate that Dr. Maurice told her supervisors that decedent had specifically refused Lovenox during this hospitalization.

¶ 47   In the trial court and in their brief before this court, defendants assert that it was not common practice and procedure at Rush to get written consent for the administering of Lovenox. Making no determination as to the validity of such assertion, we do find, however, that this assertion is contrary to Rush's consent policy, which specifically requires written consent for any treatment or procedure "which poses a risk to the patient," "after the risks and complications have been explained to the patient." We note that evidence presented in

-10-

the trial court established that the administering of Lovenox carried certain risks. We further note that although Rush's consent policy allowed for verbal consents to treatment, such verbal consents were required to be documented in the patient's medical record. It cannot be reasonably concluded that decedent gave a verbal consent to the administering of Lovenox when the record clearly indicates that he unequivocally refused Lovenox on at least three occasions.

¶ 48    Defendants next argue that Lovenox is not considered a treatment and, therefore, Rush's consent policy does not apply. The record contradicts this assertion; three of the defendant doctors met to discuss whether the Lovenox dosage should be increased, thereby suggesting that the administering of Lovenox is not a routine procedure. Moreover, the defendant doctors referred to Lovenox as a treatment in their trial testimony.

¶ 49    Viewing the evidence in the light most favorable to the plaintiff, we cannot conclude that it so overwhelmingly favors defendants such that no contrary verdict could stand based on that evidence.

¶ 50    Although not raised in the parties' briefs, based on our foregoing determination, we find a discussion as to the applicability of the emergency exception is in order.

¶ 51    The common law emergency exception is based on the doctrine of implied consent. *Curtis*, 326 Ill. App. 3d at 96. The mere existence of an emergency that places a patient at risk of future harm does not give a physician "a license to force medical treatment and ignore a patient's exercise of the right to refuse medical treatment." (Internal quotation marks omitted.) *Curtis*, 326 Ill. App. 3d at 96. Rather, where a patient expressly refuses medical treatment, or the patient's instructions specifically preclude the treatment rendered, treatment contrary to the patient's will constitutes a battery even when an emergency exists. *Curtis*, 326 Ill. App. 3d at 96.

¶ 52    There are four essential elements required for application of the common law emergency exception: (1) the existence of a medical emergency; (2) treatment was required to protect the patient's health; (3) it was impossible or impractical to obtain consent from either the patient or someone authorized to consent for the patient; and (4) there was no reason to believe that the patient would decline the treatment, given the opportunity to consent. *In re Estate of Allen*, 365 Ill. App. 3d 378, 386 (2006).

¶ 53    As to the first and second elements, defendants maintained at trial that a medical emergency existed in the form of possible life-threatening PE which required the administering of Lovenox. Defendants agreed that the June 21, 2001, CT scan did not show any evidence of PE in the decedent, but concluded that Lovenox was necessary due to decedent's increased breathing difficulty. However, the record indicates that the decedent had clearly refused Lovenox at an earlier time, and there was no evidence that any later consent was sought from decedent or his family prior to the administering of Lovenox. We find that this evidence does not establish that a medical emergency existed which would excuse any lack of consent by the decedent, so the emergency exception does not apply.

¶ 54    We therefore conclude that the entry of a directed verdict in favor of the defendants on plaintiff's medical battery claims was error and reverse and remand.

¶ 55                    Directed Verdict–Medical Negligence

¶ 56      Plaintiff further contends that the trial court erred in directing a verdict in favor of Dr. Maurice on the medical negligence claim. Plaintiff argues that Dr. Maurice was liable for decedent's death because she initiated the Lovenox treatment, continued to administer it after decedent's refusal, and agreed to increase the dose despite the fact that the June 21, 2001, CT scan did not support the continued course of treatment.

¶ 57      As stated previously, the entry of a directed verdict is reviewed *de novo*. *Bermudez*, 343 Ill. App. 3d at 29. A directed verdict will be affirmed where the evidence, viewed in the light most favorable to the plaintiff, so overwhelmingly favors the defendant that no contrary verdict based on that evidence could ever stand. *Saxton*, 240 Ill. App. 3d at 210.

¶ 58      In a medical negligence action, a plaintiff must establish: (1) the proper standard of care; (2) a deviation from that standard; and (3) an injury proximately caused by the deviation from that standard of care. *Martinez v. Elias*, 397 Ill. App. 3d 460, 467 (2010). Expert medical testimony is required to establish the standard of care and the defendant's deviation from that standard. *Elias*, 397 Ill. App. 3d at 467. The standard of care requires the defendant to act with "the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances." (Internal quotation marks omitted.) *Longnecker v. Loyola University Medical Center*, 383 Ill. App. 3d 874, 885 (2008).

¶ 59      At trial, plaintiff's expert witness, Dr. Marti, testified that the standard of care for the administering of Lovenox was set by guidelines in Rush's dosing card and the PDR. Dr. Marti stated that a patient's creatine clearance must be calculated in order to determine if the patient's kidneys are functioning properly prior to administering Lovenox. The record indicates that Dr. Maurice never calculated decedent's creatine clearance prior to ordering the initial dose of Lovenox for decedent. Moreover, decedent's CT scan did not show any sign of PE, which would not justify an increase in the Lovenox dosage. Dr. Marti opined that this deviation from the standard of care was a proximate cause of the decedent's death because one of the risks associated with the administering of Lovenox is bleeding in the brain, and the autopsy report showed that decedent died from an intracranial brain hemorrhage. As such, we find that plaintiff presented sufficient expert testimony to establish a *prima facie* case of medical negligence on the part of Dr. Maurice. It follows then that we cannot say that all of the evidence so overwhelmingly favors Dr. Maurice that a contrary verdict could not stand. We conclude that the grant of a directed verdict in favor of Dr. Maurice was error and reverse and remand.


¶ 60                           Evidentiary Issues

¶ 61      Plaintiff further contends that several of the trial court's evidentiary rulings deprived her of a fair trial. Specifically, plaintiff contends that: (1) the trial court erred in allowing defendants to testify in violation of Rule 213 that Rush's consent policy did not apply to the administering of Lovenox; (2) the trial court erred in not allowing plaintiff to present evidence or cross-examine defendants or their experts about the treatment of suspected PE during decedent's prior hospitalization; (3) the trial court improperly commented on testimony elicited by plaintiff on cross-examination of defendant's expert; and (4) the trial

court erred in not allowing plaintiff to use more than seven photographs to depict decedent's quality of life. Plaintiff additionally argues that the cumulative effect of the trial court's evidentiary rulings deprived her of a fair trial and that the jury verdict in favor of the remaining defendants on the medical negligence action should be reversed.

¶ 62        It is within the sound discretion of the trial court to admit evidence at trial. *Webber v. Wight & Co.*, 368 Ill. App. 3d 1007, 1024 (2006). The court has discretion to bar irrelevant or unreliable testimony. *Webber*, 368 Ill. App. 3d at 1024. The trial court's ruling will not be overturned unless there is an abuse of discretion. *Webber*, 368 Ill. App. 3d at 1024.

¶ 63        Plaintiff first contends that the trial court erred in allowing defendants to testify that Rush's consent policy did not require specific consent for Lovenox treatment because these opinions were not previously disclosed pursuant to Rule 213. Defendants respond that this issue is waived because plaintiff failed to object at trial or present it in her post-trial motion for new trial.

¶ 64        It is well settled that to preserve an issue for review, an objection must be made at trial and the issue must be raised in a posttrial motion. *Gillespie v. University of Chicago Hospitals*, 387 Ill. App. 3d 540, 546 (2008). The doctrine of waiver, however, is a limitation on the parties and not on this court. *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 202 (2007). Despite waiver, this court may address an issue in order to carry out its responsibility to reach a just result. *Lowrey*, 375 Ill. App. 3d at 202. Because this issue may arise again on remand, we choose to address this issue on the merits. *Lowrey*, 375 Ill. App. 3d at 202.

¶ 65        We begin by noting that plaintiff mischaracterizes the trial court's ruling. The record indicates that plaintiff was in violation of Rule 213's disclosure requirements when the trial court ruled that it would allow her to ask every doctor whether written consent was required for the administering of Lovenox, a fact which plaintiff fails to mention in her brief. Defendants objected and the trial court overruled the objection, but further ruled that defendants could "opine with all their witnesses that the consent policy did not require a consent to administer Lovenox." It appears from the record that the trial court allowed both plaintiff and defendants to circumvent Rule 213's disclosure requirements in order to allow plaintiff to present her battery claims at trial.

¶ 66        Despite plaintiff's mischaracterization, however, we have already determined that Rush's consent policy and the defendants' own testimony contradicts their assertion that consent was not required for the administering of Lovenox. Accordingly, further discussion of this issue is unnecessary.

¶ 67        Plaintiff next contends that the trial court erred when it did not allow her to cross-examine defendants and their experts regarding decedent's treatment during his prior hospitalization. She additionally contends that the trial court erred by continuing to sustain defendants' objection to her attempt to present evidence regarding decedent's prior hospitalization. Defendants argue that this issue is also waived because plaintiff failed to make an offer of proof. Plaintiff maintains that an offer of proof was unnecessary because she admitted decedent's medical records from the prior hospitalization into evidence.

¶ 68        The purpose of an offer of proof is to disclose the nature of the offered evidence to which

objection is interposed, for the information of the trial judge and opposing counsel, and to enable the reviewing court to determine whether the exclusion was erroneous and harmful. *Wright v. Stokes*, 167 Ill. App. 3d 887, 891 (1988). An offer of proof is generally required to preserve for review a question as to whether evidence was properly excluded. *Hulman v. Evanston Hospital Corp.*, 259 Ill. App. 3d 133, 147 (1994). However, an offer of proof may not be necessary where the record clearly shows that the trial court already has before it all of the evidence necessary to make an assessment regarding admissibility and possible prejudice from exclusion. *Hulman*, 259 Ill. App. 3d at 147.

¶ 69    Here, we find that plaintiff's admission of the medical records from decedent's prior hospitalization into evidence was sufficient to preserve the issue for review; thus, we will review the issue on its merits.

¶ 70    As a general rule, a party is entitled to present evidence that is relevant to its theory of the case. *People ex rel. Department of Transportation v. Kotara, L.L.C.*, 379 Ill. App. 3d 276, 286 (2008). However, the admissibility or exclusion of evidence is within the sound discretion of the trial court and will not be disturbed on review absent a clear abuse of discretion. *Kotara, L.L.C.*, 379 Ill. App. 3d at 286. Moreover, the scope of cross-examination of a witness is a matter within the sound discretion of the trial judge. *Vinke v. Artim Transportation System, Inc.*, 87 Ill. App. 3d 400, 412 (1980).

¶ 71    Here, we conclude that the trial court abused its discretion in limiting plaintiff's cross-examination of defendants and their experts regarding decedent's prior hospitalization. The record reveals that decedent was discharged from the hospital just a week prior to his final hospitalization and that he had experienced similar symptoms during that hospitalization, including breathing difficulty, which suggested a Lovenox treatment as well as a spiral CT. The discharge summary shows several calculations regarding decedent's blood count, oxygen levels and other items related to the course of treatment. The discharge summary for the prior hospitalization also reveals that decedent was hesitant about the course of treatment, and the attending physician, Dr. Silva, ordered a pulmonary consultation, and all of the doctors agreed to the course of treatment. The spiral CT was negative for PE but revealed pneumonia. Lovenox was administered to decedent during this prior hospitalization, but apparently only after certain calculations were made, a spiral CT was performed and a pulmonary consult was ordered. We find this evidence to be very relevant to the standard of care in administering Lovenox, especially when the same attending physician, Dr. Silva, was responsible for decedent's care. This ruling effectively denied plaintiff an opportunity to fully present her case and defeated her cause of action. See *State Farm Fire & Casualty Co. v. M. Walter Roofing Co.*, 271 Ill. App. 3d 42, 49 (1995). We conclude that the trial court abused its discretion in denying the admission of any evidence related to decedent's prior hospitalization.

¶ 72    Plaintiff next contends that the trial court erred when it made comments during her cross-examination of defendants' expert Dr. Newberger in front of the jury. Specifically, plaintiff contends that the trial court erred by stating that plaintiff's counsel was improperly attempting to impeach the witness and not asking questions but instead merely publishing the witness's notes.

¶ 73 A trial court has wide discretion in conducting a trial, but the court may not interject comments or opinions indicating its opinion on the credibility of a witness or the argument of counsel. *Lowrey*, 375 Ill. App. 3d at 212. The trial judge, as the dominant figure in the courtroom, should exercise caution and avoid making statements that could prejudice the jury against or in favor of a party. *Lopez v. Northwestern Memorial Hospital*, 375 Ill. App. 3d 637, 651 (2007). " 'Although a trial judge has the power to admonish or rebuke a party or counsel for misconduct ***, any rebuke in the presence of the jury should not exceed the bounds of necessity and care must be taken even then to admonish in a manner which will not deprive either party of a fair trial.' " *Lopez*, 375 Ill. App. 3d at 652 (quoting *Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 254 (1990)). A new trial will be granted on the basis of a judge's remarks or conduct only if the remarks or conduct result in prejudice to a party. *Lopez*, 375 Ill. App. 3d at 652.

¶ 74 Here, the record indicates that during plaintiff's cross-examination of Dr. Newberger, plaintiff's counsel had Newberger reading extensively from his notes. The trial court interjected, noting that counsel was not asking questions but merely publishing the notes to the jury. The court then told counsel to admit the notes into evidence and ask the witness a question. Contrary to plaintiff's assertions, we find that these comments by the trial court did not prejudice the jury against plaintiff or her counsel but merely served to have the matter proceed in a proper manner. See *Pavilon*, 204 Ill. App. 3d at 252. The record does reveal that the trial court made other comments outside the presence of the jury that were questionable at the least (you dug your own hole. You see you lost this jury three or four days ago") and made clear its feelings regarding plaintiff's counsel, and we caution against such behavior by trial courts; nevertheless, plaintiff was not prejudiced by those remarks as the jury did not hear them.

¶ 75 Plaintiff further contends that the trial court erred in only allowing her to use seven photographs of decedent as proof of her loss of society claim and to depict decedent's quality of life. Specifically, plaintiff argues that if she were allowed to present more pictures and a slide show presentation, then the jury may have believed that the decedent's death resulted from the administering of Lovenox and returned a verdict in favor of plaintiff.

¶ 76 It is well established that video and photographic exhibits are admissible if the probative value of the exhibits is not outweighed by the danger of unfair prejudice. *Luther v. Norfolk & Western Ry. Co.*, 272 Ill. App. 3d 16, 24 (1995). The relevance of a photograph is established where it tends to prove a matter in controversy. *Caponi v. Larry's 66*, 236 Ill. App. 3d 660, 674 (1992). In claims for loss of society, our supreme court has approved the depiction of a decedent's relationships through the use of photographs or video. *Caponi*, 236 Ill. App. 3d at 674. If a photograph is relevant and probative, it is not inadmissible merely because it is cumulative. *Caponi*, 236 Ill. App. 3d at 675.

¶ 77 Because plaintiff sought damages for the loss of decedent's society, the value of their relationship was at issue. Here, plaintiff was allowed to present seven photographs in the loss of society claim; four for the wife, and one for each child. Decedent and plaintiff were married almost 50 years and had adult children. Their relationship included the loss of emotional, intangible aspects including companionship, guidance and happiness and the value of such elements are impacted by the duration of a relationship. See *Caponi*, 236 Ill.

App. 3d at 675. As such, we conclude that additional photographs and the slide show presentation should have been admitted, regardless of any cumulative nature of the images.

¶ 78 Finally, plaintiff contends that she was deprived of a fair trial because of the cumulative effect of the trial court's rulings. We agree that plaintiff was deprived of a fair trial due to the several erroneous evidentiary rulings by the trial court as set forth above. As such, we reverse and remand for a new trial.

¶ 79                                    Forfeited Issues

¶ 80 Although plaintiff has raised additional issues on appeal, she failed to cite to any legal authority in support of her claims in violation of Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008). Specifically, plaintiff contends that: (1) the trial court erred in not allowing her time to review and respond to defendants' motion for directed verdict; (2) the trial court erred in allowing defendants and their experts to testify that the CT scan performed on June 21, 2001, was an improper diagnostic tool for determining if decedent should have been on a preventative dose versus therapeutic dose of Lovenox; (3) the trial court erred in barring testimony and cross-examination of defendants and their experts regarding the reduction of the Lovenox dosage based on the CT scan results; (4) the trial court erred in allowing defendants to qualify Dr. Schlieben as a nephrologist/kidney expert because he did not obtain those qualification until after the decedent's death, and further in allowing him to testify to undisclosed opinions in violation of Rule 213; and (6) the trial court erred in denying plaintiff's written and oral motions for a mistrial, to bar evidence or to permit rebuttal because of the numerous violations of Rule 213.

¶ 81 Supreme Court Rule 341(h)(7), sets forth the requirements for an appellant's brief. In pertinent part, Rule 341(h)(7) provides:

"Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. Evidence shall not be copied at length, but reference shall be made to the pages of the record on appeal or abstract, if any, where the evidence may be found. Citation of numerous authorities in support of the same point is not favored. Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008).

Failure to raise arguments or cite legal authority is a violation of Rule 341(h)(7) and results in forfeiture of the issue. *Vancura v. Katris*, 238 Ill. 2d 352, 369 (2010).

¶ 82 Here, plaintiff failed to cite to any legal authority in support of these additional issues for which she seeks review on appeal in violation of Rule 341(h)(7). Accordingly, plaintiff has forfeited review of these issues on appeal.

¶ 83                                     CONCLUSION

¶ 84 For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause is remanded.

¶ 85 Reversed; cause remanded.